JUDGE BERMAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

KEVIN P. FITZPATRICK, et al.,

                           Plaintiffs,

                 v.

AMERICAN INTERNATIONAL GROUP, INC., AIG
GLOBAL REAL ESTATE INVESTMENT
CORPORATION,

                          Defendants.

-------------------------------------------------------------------- x

Case No.: **10 CIV 0142**

Removed from:
     Supreme Court of the State of New
     York County of New York

New York County Index No. 09603710
Date Filed: December 9, 2009

JAN 08 2010

U.S.D.C. S.D. N.Y.
CASHIERS

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1331, 1441 and 1446,
Defendants American International Group, Inc. ("AIG") and AIG Global Real Estate Investment
Corporation ("GRE"), by their attorneys DLA Piper LLP (US), hereby remove this civil action
pending in the Supreme Court of the State of New York, New York County, Index No.
09603710, entitled Kevin P. Fitzpatrick, et al. v. American International Group, Inc., et al. (the
"State Court Action"), to the United States District Court for the Southern District of New York.
Removal is based on the following:

     1.     On December 9, 2009, Plaintiff Kevin P. Fitzpatrick, individually and on behalf
of various entities, commenced the State Court Action by filing a Summons and Complaint in the
Supreme Court of the State of New York, New York County.

     2.     Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is being filed within
thirty days of receipt of the initial pleading. Defendants received a courtesy copy of the
Complaint on December 9, 2009, and, by the parties' agreement, counsel for Defendants
accepted service of the Summons and Complaint on December 22, 2009.

3.      This action is removable under 28 U.S.C. § 1331 and this Court has federal question subject matter jurisdiction.  Specifically, the Complaint alleges a denial of pension benefits under a plan provided by Mr. Fitzpatrick's former employer, which claim is preempted by the Employee Retirement Income Security Act of 1947, as amended, §§ 1001-1461 ("ERISA").  See, e.g., Aetna Health Inc. v. Davila, 542 U.S. 200, 124 S. Ct. 2488 (2004). Therefore, pursuant to 28 U.S.C. § 1441(c), "the entire case may be removed and the district court may determine all issues."

4.      While the Complaint purports to characterize his claim as a state law action for declaratory relief that Mr. Fitzpatrick is entitled to "early retirement benefits" from AIG, "including the ability to purchase AIG medical insurance at employee rates for life," this claim falls squarely within the scope of ERISA.  (Complaint, ¶ 262.)  The relief Mr. Fitzpatrick seeks is to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  ERISA § 502(a); 29 U.S.C. § 1132(a).  Mr. Fitzpatrick improperly attempts to substitute state court remedies for ERISA's exclusive enforcement provision.  The Complaint therefore explicitly presents a federal question on its face.

5.      Mr. Fitzpatrick's claim is also preempted because it "relates to" ERISA-regulated plans.  ERISA § 514(a); 29 U.S.C. § 1144(a).  Specifically, Mr. Fitzpatrick alleges that "[u]nder AIG's standard policies, executives whose employment ends subsequent to their 55th birthday are eligible for retirement benefits, including a pension, inclusion in the AIG medical plan, and the lifetime right to purchase medical insurance at AIG employee rates."  (Complaint, ¶ 225.) ERISA governs and otherwise regulates "employee benefit plans," which are defined to include

2

any "employee welfare plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3).

    a.    An "employee welfare plan" is defined to include "any plan . . . established or maintained by an employer . . . to the extent that such plan . . . was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . ." 29 U.S.C. § 1002(1). This definition covers Fitzpatrick's claim in the Complaint for medical coverage. (Complaint, ¶¶ 225, 257-66.)

    b.    An "employee pension plan" is defined to include "any plan . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan . . . (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . ." 29 U.S.C. § 1002(2)(A). This definition covers Fitzpatrick's claim in the Complaint for early retirement benefits. (Complaint, ¶¶ 355, 257-66.)

    6.    Pursuant to the complete preemption doctrine of Section 502 of ERISA, Mr. Fitzpatrick's state-law cause of action for early retirement benefits duplicates the relief available under ERISA, seeks relief within the scope of ERISA and must be re-characterized as arising under federal law. Aetna Health Inc., 542 U.S. at 207-08, 124 S. Ct. 2494-95. This Court has "exclusive jurisdiction" over Mr. Fitzpatrick's ERISA cause of action, making the entire Complaint removable to federal court. ERISA 502(e); 29 U.S.C. § 1132(e); Metropolitan Life

Ins. Co. v. Taylor, 481 U.S. 58, 107 S. Ct. 1542 (1987). Pursuant to 28 U.S.C. § 1367(a), this Court has "supplemental jurisdiction" over all other causes of action alleged in the Complaint, which "form part of the same case or controversy." 28 U.S.C. § 1367(a).

7.     The United States District Court for the Southern District of New York is the appropriate Court for filing a notice of removal from the Supreme Court of the State of New York, New York County, because it is the Court for the district embracing the place where the action is pending. See 28 U.S.C. § 1441(a).

8.     Pursuant to 28 U.S.C. 1446(a), true and correct copies of the Summons and Complaint are attached hereto as Exhibit 1. No other pleading, process or order relating to this action has been served upon Defendants.

9.     Pursuant to 28 U.S.C. § 1446(d), written notice of this Notice of Removal will be given promptly to Plaintiff through the Notice to Adverse Party of Filing of a Notice of Removal, attached hereto as Exhibit 2.

10.    Pursuant to 28 U.S.C. § 1446(d), written notice of this Notice of Removal will be filed promptly with the Clerk of the Supreme Court of the State of New York, New York County in order to effect removal through the Notice of Filing Notice of Removal, attached hereto as Exhibit 3.

11.    By filing this Notice of Removal, Defendants do not waive any defenses that they may have to the claims set forth in the Complaint.

WHEREFORE, Defendants American International Group, Inc. and AIG Global Real Estate Investment Corporation respectfully request that the State Court Action pending in the Supreme Court of New York for New York County be removed to this Court.

4

Dated: New York, New York
      January 8, 2010

DLA PIPER LLP (US)

By: _____

    Charles P. Scheeler *(not admitted to practice in*
     *New York; pro hac vice motion to be filed)*
    Keara M. Gordon
    Stephanie K. Vogel
    1251 Avenue of the Americas
    New York, New York  10020
    (212) 335-4500 (telephone)
    (212) 335-4501 (facsimile)
    charles.scheeler@dlapiper.com
    keara.gordon@dlapiper.com
    stephanie.vogel@dlapiper.com

    Attorneys for Defendants American
     International Group, Inc. and AIG Global
     Real Estate Investment Corporation

# Exhibit  1a

SCANNED ON 12/9/2009

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

KEVIN P. FITZPATRICK, KPF MANAGEMENT,
INC., NAVY LIMITED, VALLEY TRUNK
HOLDINGS, LLC, individually, and derivatively on
behalf of TRIBECA AIG JAPAN DIRECT
(CAYMAN) I, L.P., TRIBECA AIG JAPAN DIRECT
(CAYMAN) U.S. I, L.P., TRIBECA ASIA FUND I
LLC, TRIBECA ASIA FUND II LLC, TRIBECA
ATLANTIC I LLC, TRIBECA BAKER I LLC,
TRIBECA BAKER II LLC, TRIBECA BAKER III
LLC, TRIBECA BAKER IV LLC, TRIBECA
CARIBBEAN RETAIL LLC, TRIBECA EAST
COAST PORTFOLIO LLC, TRIBECA EUROPE
DIRECT LLC, TRIBECA EUROPE FUND I LLC,
TRIBECA EUROPE FUND II LLC, TRIBECA INDIA
DIRECT LLC, TRIBECA INDIA FUND I (CAYMAN)
L.P., TRIBECA INDUSTRIAL III LLC, TRIBECA
JAPAN FUND I (CAYMAN) L.P., TRIBECA JAPAN
FUND I LLC, TRIBECA JAPAN FUND II
(CAYMAN) L.P., TRIBECA JAPAN FUND II LLC,
TRIBECA JAPAN FUND III (CAYMAN) L.P.,
TRIBECA JAPAN FUND III LLC, TRIBECA KOREA
FUND I LLC, TRIBECA LINCOLN I LLC, TRIBECA
LINCOLN II LLC, TRIBECA LINCOLN III LLC,
TRIBECA LINCOLN IV LLC, TRIBECA LOUDON
LLC, TRIBECA MEXICO FUND I LLC, TRIBECA
MEXICO INDUSTRIAL I L.P., TRIBECA MIDDLE
EAST LLC, TRIBECA MIDWEST LAND
DEVELOPMENT LLC, TRIBECA NNP IV LLC,
TRIBECA NOPAL LLC, TRIBECA OCNG LLC,
TRIBECA PPP I (JAPAN) L.P., TRIBECA PPP I (US)
L.P., TRIBECA PPP II (JAPAN) L.P., TRIBECA PPP
II (U.S.) L.P., TRIBECA RESIDENTIAL FUND I
LLC, TRIBECA RESIDENTIAL I LLC, TRIBECA
RESIDENTIAL II LLC, TRIBECA RESIDENTIAL III
LLC, TRIBECA RESIDENTIAL IV LLC, TRIBECA
ROPPONGI (JAPAN) I L.P., TRIBECA ROPPONGI
(U.S.) I L.P., TRIBECA TERRABROOK I LLC,
TRIBECA TRIVEST I LLC, TRIBECA U.S.
INDUSTRIAL I LLC, TRIBECA U.S. INDUSTRIAL
II LLC, TRIBECA WEST I LLC AND TRIBECA
WEST II LLC, AIGGRE ASIA FUND MURRAY
HILL II LLC, AIGGRE ATLANTIC CHELSEA I
LLC, AIGGRE ATLANTIC MURRAY HILL I LLC,
AIGGRE BAKER MURRAY HILL I LLC, AIGGRE

Index No:

**0 9 6 0 3 7 1 0**

Date Purchased

Plaintiffs designate New York County as
the place of trial.

The basis of the venue is Defendants'
residence and prior agreement of the
parties.

**SUMMONS**



FILED

DEC - 9 2009

COUNTY CLERK'S OFFICE
NEW YORK

CARRIBEAN RETAIL MURRAY HILL I LLC,
AIGGRE MURRAY HILL EAST COAST
PORTFOLIO LLC, AIGGRE EAST COAST
PORTFOLIO CHELSEA LLC, AIGGRE EUROPE
FUND MURRAY HILL I LLC, AIGGRE EUROPE
FUND MURRAY HILL II LLC, AIGGRE MURRAY
HILL EUROPE DIRECT LLC, AIGGRE CHELSEA
EUROPE DIRECT LLC, AIGGRE U.S. INDUSTRIAL
MURRAY HILL I LLC, AIGGRE U.S. INDUSTRIAL
CHELSEA I LLC, AIGGRE U.S. INDUSTRIAL
MURRAY HILL II LLC, AIGGRE U.S. INDUSTRIAL
CHELSEA II LLC, AIGGRE INDUSTRIAL
MURRAY HILL III LLC, AIGGRE INDUSTRIAL
CHELSEA III LLC, AIGGRE LINCOLN CHELSEA I
LLC, AIGGRE LINCOLN MURRAY HILL I LLC,
AIGGRE KOREA FUND MURRAY HILL I LLC,
AIGGRE MURRAY HILL LOUDON LLC, AIGGRE
CHELSEA LOUDON LLC, AIGGRE MEXICO FUND
MURRAY HILL LLC, AIGGRE CHELSEA MIDDLE
EAST LLC, AIGGRE MURRAY HILL MIDDLE
EAST LLC, AIGGRE CHELSEA MIDWEST LAND
DEVELOPMENT LLC, AIGGRE MURRAY HILL
MIDWEST LAND DEVELOPMENT LLC, AIGGRE
NNP IV CHELSEA, LLC, AIGGRE NNP IV
MURRAY HILL, LLC, AIGGRE MURRAY HILL
NOPAL LLC, AIGGRE CHELSEA NOPAL LLC,
AIGGRE CHELSEA OCNG LLC, AIGGRE
MURRAY HILL OCNG LLC, AIGGRE
RESIDENTIAL MURRAY HILL I LLC, AIGGRE
RESIDENTIAL CHELSEA I LLC, AIGGRE
RESIDENTIAL FUND MURRAY HILL I LLC,
AIGGRE RESIDENTIAL MURRAY HILL II LLC,
AIGGRE RESIDENTIAL CHELSEA II LLC,
AIGGRE RESIDENTIAL MURRAY HILL III LLC,
AIGGRE RESIDENTIAL CHELSEA III LLC,
AIGGRE RESIDENTIAL MURRAY HILL IV LLC,
AIGGRE RESIDENTIAL CHELSEA IV LLC,
AIGGRE TERRABROOK MURRAY HILL I LLC,
AIGGRE TERRABROOK CHELSEA I LLC, AIGGRE
TRIVEST MURRAY HILL I LLC, AIGGRE
TRIVEST CHELSEA I LLC, AIGGRE WEST
MURRAY HILL I LLC, AIGGRE WEST CHELSEA I
LLC, AIGGRE CHELSEA WEST II LLC, AIGGRE
MURRAY HILL WEST II LLC, EUROPE FUND
SOHO I LLC, JAPAN FUND SOHO I L.P., JAPAN
FUND SOHO II L.P, JAPAN FUND SOHO III L.P,

MEXICO FUND SOHO I LLC, RESIDENTIAL
FUND SOHO I LLC, SOUTH KOREA FUND SOHO
L.P.,

        Plaintiffs,

      -against-

AMERICAN INTERNATIONAL GROUP, INC., AIG
GLOBAL REAL ESTATE INVESTMENT
CORPORATION,

        Defendant.

      YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a

copy of your Answer, or, if the Complaint is not served with this Summons, to serve a notice of

appearance, on the Plaintiffs' attorneys within 20 days after the service of this Summons,

exclusive of the day of service (or within 30 days after service is complete if this Summons is not

personally delivered to you within the State of New York); and in case of your failure to appeal

or answer, judgment will be taken against you by default for the relief demanded in the

Complaint.

      Dated:        December 9, 2009

                        By:    _____

                                 Sean F. O'Shea
                               Michael E. Petrella
                               **O'Shea Partners LLP**
                               521 Fifth Avenue, 25th Floor
                               New York, New York  10175
                               Tel:   (212) 682-4426
                               Fax:   (212) 682-4437

To:

American International Group, Inc.
70 Pine Street
New York, New York 10270

AIG Global Real Estate Investment Corporation
277 Park Avenue, 44th Floor
New York, New York 10172

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

09603710

KEVIN P. FITZPATRICK, KPF MANAGEMENT,
INC., NAVY LIMITED, VALLEY TRUNK
HOLDINGS, LLC, individually, and derivatively on
behalf of TRIBECA AIG JAPAN DIRECT
(CAYMAN) I, L.P., TRIBECA AIG JAPAN DIRECT
(CAYMAN) U.S. I, L.P., TRIBECA ASIA FUND I
LLC, TRIBECA ASIA FUND II LLC, TRIBECA
ATLANTIC I LLC, TRIBECA BAKER I LLC,
TRIBECA BAKER II LLC, TRIBECA BAKER III
LLC, TRIBECA BAKER IV LLC, TRIBECA
CARIBBEAN RETAIL I LLC, TRIBECA EAST
COAST PORTFOLIO LLC, TRIBECA EUROPE
DIRECT LLC, TRIBECA EUROPE FUND I LLC,
TRIBECA EUROPE FUND II LLC, TRIBECA INDIA
DIRECT LLC, TRIBECA INDIA FUND I (CAYMAN)
L.P., TRIBECA INDUSTRIAL III LLC, TRIBECA
JAPAN FUND I (CAYMAN) L.P., TRIBECA JAPAN
FUND I LLC, TRIBECA JAPAN FUND II
(CAYMAN) L.P., TRIBECA JAPAN FUND II LLC,
TRIBECA JAPAN FUND III (CAYMAN) L.P.,
TRIBECA JAPAN FUND III LLC, TRIBECA KOREA
FUND I LLC, TRIBECA LINCOLN I LLC, TRIBECA
LINCOLN II LLC, TRIBECA LINCOLN III LLC,
TRIBECA LINCOLN IV LLC, TRIBECA LOUDON
LLC, TRIBECA MEXICO FUND I LLC, TRIBECA
MEXICO INDUSTRIAL I L.P., TRIBECA MIDDLE
EAST LLC, TRIBECA MIDWEST LAND
DEVELOPMENT LLC, TRIBECA NNP IV LLC,
TRIBECA NOPAL LLC, TRIBECA OCNG LLC,
TRIBECA PPP I (JAPAN) L.P., TRIBECA PPP I (US)
L.P., TRIBECA PPP II (JAPAN) L.P., TRIBECA PPP
II (U.S.) L.P., TRIBECA RESIDENTIAL FUND I
LLC, TRIBECA RESIDENTIAL I LLC, TRIBECA
RESIDENTIAL II LLC, TRIBECA RESIDENTIAL III
LLC, TRIBECA RESIDENTIAL IV LLC, TRIBECA
ROPPONGI (JAPAN) I L.P., TRIBECA ROPPONGI
(U.S.) I L.P., TRIBECA TERRABROOK I LLC,
TRIBECA TRIVEST I LLC, TRIBECA U.S.
INDUSTRIAL I LLC, TRIBECA U.S. INDUSTRIAL
II LLC, TRIBECA WEST I LLC AND TRIBECA
WEST II LLC, AIGGRE ASIA FUND MURRAY
HILL II LLC, AIGGRE ATLANTIC CHELSEA I
LLC, AIGGRE ATLANTIC MURRAY HILL I LLC,

Index No: _____

**COMPLAINT**



FILED

DEC - 9 2009

COUNTY CLERK'S OFFICE
NEW YORK

AIGGRE BAKER MURRAY HILL I LLC, AIGGRE
CARRIBEAN RETAIL MURRAY HILL I LLC,
AIGGRE MURRAY HILL EAST COAST
PORTFOLIO LLC, AIGGRE EAST COAST
PORTFOLIO CHELSEA LLC, AIGGRE EUROPE
FUND MURRAY HILL I LLC, AIGGRE EUROPE
FUND MURRAY HILL II LLC, AIGGRE MURRAY
HILL EUROPE DIRECT LLC, AIGGRE CHELSEA
EUROPE DIRECT LLC, AIGGRE U.S. INDUSTRIAL
MURRAY HILL I LLC, AIGGRE U.S. INDUSTRIAL
CHELSEA I LLC, AIGGRE U.S. INDUSTRIAL
MURRAY HILL II LLC, AIGGRE U.S. INDUSTRIAL
CHELSEA II LLC, AIGGRE INDUSTRIAL
MURRAY HILL III LLC, AIGGRE INDUSTRIAL
CHELSEA III LLC, AIGGRE LINCOLN CHELSEA I
LLC, AIGGRE LINCOLN MURRAY HILL I LLC,
AIGGRE KOREA FUND MURRAY HILL I LLC,
AIGGRE MURRAY HILL LOUDON LLC, AIGGRE
CHELSEA LOUDON LLC, AIGGRE MEXICO FUND
MURRAY HILL LLC, AIGGRE CHELSEA MIDDLE
EAST LLC, AIGGRE MURRAY HILL MIDDLE
EAST LLC, AIGGRE CHELSEA MIDWEST LAND
DEVELOPMENT LLC, AIGGRE MURRAY HILL
MIDWEST LAND DEVELOPMENT LLC, AIGGRE
NNP IV CHELSEA, LLC, AIGGRE NNP IV
MURRAY HILL, LLC, AIGGRE MURRAY HILL
NOPAL LLC, AIGGRE CHELSEA NOPAL LLC,
AIGGRE CHELSEA OCNG LLC, AIGGRE
MURRAY HILL OCNG LLC, AIGGRE
RESIDENTIAL MURRAY HILL I LLC, AIGGRE
RESIDENTIAL CHELSEA I LLC, AIGGRE
RESIDENTIAL FUND MURRAY HILL I LLC,
AIGGRE RESIDENTIAL MURRAY HILL II LLC,
AIGGRE RESIDENTIAL CHELSEA II LLC,
AIGGRE RESIDENTIAL MURRAY HILL III LLC,
AIGGRE RESIDENTIAL CHELSEA III LLC,
AIGGRE RESIDENTIAL MURRAY HILL IV LLC,
AIGGRE RESIDENTIAL CHELSEA IV LLC,
AIGGRE TERRABROOK MURRAY HILL I LLC,
AIGGRE TERRABROOK CHELSEA I LLC, AIGGRE
TRIVEST MURRAY HILL I LLC, AIGGRE
TRIVEST CHELSEA I LLC, AIGGRE WEST
MURRAY HILL I LLC, AIGGRE WEST CHELSEA I
LLC, AIGGRE CHELSEA WEST II LLC, AIGGRE
MURRAY HILL WEST II LLC, EUROPE FUND
SOHO I LLC, JAPAN FUND SOHO I L.P., JAPAN

FUND SOHO II L.P, JAPAN FUND SOHO III L.P.,
MEXICO FUND SOHO I LLC, RESIDENTIAL
FUND SOHO I LLC, SOUTH KOREA FUND SOHO
L.P.,

                Plaintiffs,

                -against-

AMERICAN INTERNATIONAL GROUP, INC., AIG
GLOBAL REAL ESTATE INVESTMENT
CORPORATION,

                Defendant.

Plaintiffs Kevin P. Fitzpatrick ("Fitzpatrick"), KPF Management, Inc. ("KPF Management"), Navy Limited and Valley Trunk Holdings, LLC ("Valley Trunk"), individually, and derivatively on behalf of Tribeca AIG Japan Direct (Cayman) I, L.P., Tribeca AIG Japan Direct (Cayman) U.S. I, L.P., Tribeca Asia Fund I LLC, Tribeca Asia Fund II LLC, Tribeca Atlantic I LLC, Tribeca Baker I LLC, Tribeca Baker II LLC, Tribeca Baker III LLC, Tribeca Baker IV LLC, Tribeca Caribbean Retail I LLC, Tribeca East Coast Portfolio LLC, Tribeca Europe Direct LLC, Tribeca Europe Fund I LLC, Tribeca Europe Fund II LLC, Tribeca India Direct LLC, Tribeca India Fund I (Cayman) L.P., Tribeca Industrial III LLC, Tribeca Japan Fund I (Cayman) L.P., Tribeca Japan Fund I LLC, Tribeca Japan Fund II (Cayman) L.P., Tribeca Japan Fund II LLC, Tribeca Japan Fund III (Cayman) L.P., Tribeca Japan Fund III LLC, Tribeca Korea Fund I LLC, Tribeca Lincoln I LLC, Tribeca Lincoln II LLC, Tribeca Lincoln III LLC, Tribeca Lincoln IV LLC, Tribeca Loudon LLC, Tribeca Mexico Fund I LLC, Tribeca Mexico Industrial I L.P., Tribeca Middle East LLC, Tribeca Midwest Land Development LLC, Tribeca NNP IV LLC, Tribeca Nopal LLC, Tribeca OCNG LLC, Tribeca PPP I (Japan) L.P., Tribeca PPP I (Us) L.P., Tribeca PPP II (Japan) L.P., Tribeca PPP II (U.S.) L.P., Tribeca Residential Fund I LLC, Tribeca Residential I LLC, Tribeca Residential II LLC, Tribeca Residential III LLC, Tribeca Residential IV LLC, Tribeca Roppongi (Japan) I L.P., Tribeca Roppongi (U.S.) I L.P., Tribeca Terrabrook I LLC, Tribeca Trivest I LLC, Tribeca U.S. Industrial I LLC, Tribeca

U.S. Industrial II LLC, Tribeca West I LLC, Tribeca West II LLC, Asia Fund Murray Hill II LLC, AIGGRE Atlantic Chelsea I LLC, AIGGRE Atlantic Murray Hill I LLC, AIGGRE Baker Murray Hill I LLC, AIGGRE Carribean Retail Murray Hill I LLC, AIGGRE Murray Hill East Coast Portfolio LLC, AIGGRE East Coast Portfolio Chelsea LLC, AIGGRE Europe Fund Murray Hill I LLC, AIGGRE Europe Fund Murray Hill II LLC, AIGGRE Murray Hill Europe Direct LLC, AIGGRE Chelsea Europe Direct LLC, AIGGRE U.S. Industrial Murray Hill I LLC, AIGGRE U.S. Industrial Chelsea I LLC, AIGGRE U.S. Industrial Murray Hill II LLC, AIGGRE U.S. Industrial Chelsea II LLC, AIGGRE Industrial Murray Hill III LLC, AIGGRE Industrial Chelsea III LLC, AIGGRE Lincoln Chelsea I LLC, AIGGRE Lincoln Murray Hill I LLC, AIGGRE Murray Hill Loudon LLC, AIGGRE Chelsea Loudon LLC, AIGGRE Mexico Fund Murray Hill LLC, AIGGRE Chelsea Middle East LLC, AIGGRE Murray Hill Middle East LLC, AIGGRE Chelsea Midwest Land Development LLC, AIGGRE Murray Hill Midwest Land Development LLC, AIGGRE NNP IV Chelsea, LLC, AIGGRE NNP IV Murray Hill, LLC, AIGGRE Murray Hill Nopal LLC, AIGGRE Chelsea Nopal LLC, AIGGRE Chelsea OCNG LLC, AIGGRE Murray Hill OCNG LLC, AIGGRE Residential Murray Hill I LLC, AIGGRE Residential Chelsea I LLC, AIGGRE Residential Fund Murray Hill I LLC, AIGGRE Residential Murray Hill II LLC, AIGGRE Residential Chelsea II LLC, AIGGRE Residential Murray Hill III LLC, AIGGRE Residential Chelsea III LLC, AIGGRE Residential Murray Hill IV LLC, AIGGRE Residential Chelsea IV LLC, AIGGRE Terrabrook Murray Hill I LLC, AIGGRE Terrabrook Chelsea I LLC, AIGGRE Trivest Murray Hill I LLC, AIGGRE Trivest Chelsea I LLC, AIGGRE West Murray Hill I LLC, AIGGRE West Chelsea I LLC, AIGGRE Chelsea West II LLC, AIGGRE Murray Hill West II LLC, Europe Fund Soho I LLC, Japan Fund Soho I L.P., Japan Fund Soho II L.P., Japan Fund Soho III L.P., Mexico Fund Soho I LLC, Residential Fund Soho I LLC, South Korea Fund Soho L.P., by and through their attorneys, O'Shea Partners LLP, for their Complaint against Defendants American International Group, Inc. ("AIG") and AIG Global Real Estate Investment Corporation ("AIGGRE" and collectively with AIG, "AIG"), hereby allege as follows:

4

## THE PARTIES

1.      Plaintiff Kevin Fitzpatrick, an individual, is a resident of New Jersey.

2.      Plaintiff KPF Management, Inc. is a Delaware corporation with its principal place of business in New Jersey.

3.      Plaintiff Navy Limited is a Cayman Islands corporation with its principal place of business in New Jersey.

4.      Plaintiff Valley Trunk Holdings, LLC is a Delaware limited liability company with its principal place of business in New Jersey.

5.      Plaintiff Europe Fund Soho I LLC is a Delaware limited liability company with its principal place of business in Georgia

6.      Plaintiff Japan Fund Soho I. L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

7.      Plaintiff Japan Fund Soho II L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

8.      Plaintiff Japan Fund Soho III L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

9.      Plaintiff Mexico Fund Soho I LLC is a Delaware limited liability company with its principal place of business in Georgia.

10.      Plaintiff Residential Fund Soho I LLC is a Delaware limited liability company with its principal place of business in Georgia.

11.      Plaintiff South Korea Fund Soho I L.P. is a Cayman Islands limited partnership with its principal place of business in Georgia.

12.      Plaintiff Tribeca AIG Japan Direct (Cayman) I, L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

13.      Plaintiff Tribeca AIG Japan Direct (Cayman) U.S. I, L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

14.      Plaintiff Tribeca Asia Fund I LLC is a Delaware limited liability company with its

5

principal place of business in Georgia.

15.     Plaintiff Tribeca Asia Fund II LLC is a Delaware limited liability company with its principal place of business in Georgia.

16.     Plaintiff Tribeca Atlantic I LLC is a Delaware limited liability company with its principal place of business in Georgia.

17.     Plaintiff Tribeca Baker I LLC is a Delaware limited liability company with its principal place of business in Georgia.

18.     Plaintiff Tribeca Baker II LLC is a Delaware limited liability company with its principal place of business in Georgia.

19.     Plaintiff Tribeca Baker III LLC is a Delaware limited liability company with its principal place of business in Georgia.

20.     Plaintiff Tribeca Baker IV LLC is a Delaware limited liability company with its principal place of business in Georgia.

21.     Plaintiff Tribeca Caribbean Retail I LLC is a Delaware limited liability company with its principal place of business in Georgia.

22.     Plaintiff Tribeca East Coast Portfolio LLC is a Delaware limited liability company with its principal place of business in Georgia.

23.     Plaintiff Tribeca Europe Direct LLC is a Delaware limited liability company with its principal place of business in, Georgia.

24.     Plaintiff Tribeca Europe Fund I LLC is a Delaware limited liability company with its principal place of business in Georgia.

25.     Plaintiff Tribeca Europe Fund II LLC is a Delaware limited liability company with its principal place of business in Georgia.

26.     Plaintiff Tribeca India Direct LLC is a Delaware limited liability company with its principal place of business in Georgia.

27.     Plaintiff Tribeca India Fund I (Cayman) L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

6

28.     Plaintiff Tribeca Industrial III LLC is a Delaware limited liability company with its principal place of business in Georgia.

29.     Plaintiff Tribeca Japan Fund I (Cayman) L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

30.     Plaintiff Tribeca Japan Fund I LLC is a Delaware limited liability company with its principal place of business in Georgia.

31.     Plaintiff Tribeca Japan Fund II (Cayman) L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

32.     Plaintiff Tribeca Japan Fund II LLC is a Delaware limited liability company with its principal place of business in Georgia.

33.     Plaintiff Tribeca Japan Fund III (Cayman) L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

34.     Plaintiff Tribeca Japan Fund III LLC is a Delaware limited liability company with its principal place of business in Georgia.

35.     Plaintiff Tribeca Korea Fund I LLC is a Delaware limited liability company with its principal place of business in Georgia.

36.     Plaintiff Tribeca Lincoln I LLC is a Delaware limited liability company with its principal place of business in Georgia.

37.     Plaintiff Tribeca Lincoln II LLC is a Delaware limited liability company with its principal place of business in Georgia.

38.     Plaintiff Tribeca Lincoln III LLC is a Delaware limited liability company with its principal place of business in Georgia.

39.     Plaintiff Tribeca Lincoln IV LLC is a Delaware limited liability company with its principal place of business in Georgia.

40.     Plaintiff Tribeca Loudon LLC is a Delaware limited liability company with its principal place of business in Georgia.

41.     Plaintiff Tribeca Mexico Fund I LLC is a Delaware limited liability company with

its principal place of business in Georgia.

42.     Plaintiff Tribeca Mexico Industrial I L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

43.     Plaintiff Tribeca Middle East LLC is a Delaware limited liability company with its principal place of business in Georgia.

44.     Plaintiff Tribeca Midwest Land Development LLC is a Delaware limited liability company with its principal place of business in Georgia.

45.     Plaintiff Tribeca NNP IV LLC is a Delaware limited liability company with its principal place of business in Georgia.

46.     Plaintiff Tribeca Nopal LLC is a Delaware limited liability company with its principal place of business in Georgia.

47.     Plaintiff Tribeca OCNG LLC is a Delaware limited liability company with its principal place of business in Georgia.

48.     Plaintiff Tribeca PPP I (Japan) L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

49.     Plaintiff Tribeca PPP I (US) L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

50.     Plaintiff Tribeca PPP II (Japan) L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

51.     Plaintiff Tribeca PPP II (U.S.) L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

52.     Plaintiff Tribeca Residential Fund I LLC is a Delaware limited liability company with its principal place of business in Georgia.

53.     Plaintiff Tribeca Residential I LLC is a Delaware limited liability company with its principal place of business in Georgia.

54.     Plaintiff Tribeca Residential II LLC is a Delaware limited liability company with its principal place of business in Georgia.

55.     Plaintiff Tribeca Residential III LLC is a Delaware limited liability company with its principal place of business in Georgia.

56.     Plaintiff Tribeca Residential IV LLC is a Delaware limited liability company with its principal place of business in Georgia.

57.     Plaintiff Tribeca Roppongi (Japan) I L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

58.     Plaintiff Tribeca Roppongi (U.S.) I L.P. is a Cayman Islands exempted limited partnership with its principal place of business in Georgia.

59.     Plaintiff Tribeca Terrabrook I LLC is a Delaware limited liability company with its principal place of business in Georgia.

60.     Plaintiff Tribeca Trivest I LLC is a Delaware limited liability company with its principal place of business in Georgia.

61.     Plaintiff Tribeca U.S. Industrial I LLC is a Delaware limited liability company with its principal place of business in Georgia.

62.     Plaintiff Tribeca U.S. Industrial II LLC is a Delaware limited liability company with its principal place of business in Georgia.

63.     Plaintiff Tribeca West I LLC is a Delaware limited liability company with its principal place of business in Georgia.

64.     Plaintiff Tribeca West II LLC is a Delaware limited liability company with its principal place of business in Georgia.

65.     Plaintiff Asia Fund Murray Hill II LLC is a Delaware limited liability company with its principal place of business in New York.

66.     Plaintiff AIGGRE Atlantic Chelsea I LLC is a Delaware limited liability company with its principal place of business in New York.

67.     Plaintiff AIGGRE Atlantic Murray Hill I LLC is a Delaware limited liability company with its principal place of business in New York.

68.     Plaintiff AIGGRE Baker Murray Hill I LLC is a Delaware limited liability

9

company with its principal place of business in New York.

69.     Plaintiff AIGGRE Carribean Retail Murray Hill I LLC is a Delaware limited liability company with its principal place of business in New York.

70.     Plaintiff AIGGRE Murray Hill East Coast Portfolio LLC is a Delaware limited liability company with its principal place of business in New York.

71.     Plaintiff AIGGRE East Coast Portfolio Chelsea LLC is a Delaware limited liability company with its principal place of business in New York.

72.     Plaintiff AIGGRE Europe Fund Murray Hill I LLC is a Delaware limited liability company with its principal place of business in New York.

73.     Plaintiff AIGGRE Europe Fund Murray Hill II LLC is a Delaware limited liability company with its principal place of business in New York.

74.     Plaintiff AIGGRE Korea Fund Murray Hill I LLC is a Delaware limited liability company with its principal place of business in Georgia.

75.     Plaintiff AIGGRE Murray Hill Europe Direct LLC is a Delaware limited liability company with its principal place of business in New York.

76.     Plaintiff AIGGRE Chelsea Europe Direct LLC is a Delaware limited liability company with its principal place of business in New York.

77.     Plaintiff AIGGRE U.S. Industrial Murray Hill I LLC is a Delaware limited liability company with its principal place of business in New York.

78.     Plaintiff AIGGRE U.S. Industrial Chelsea I LLC is a Delaware limited liability company with its principal place of business in New York.

79.     Plaintiff AIGGRE U.S. Industrial Murray Hill II LLC is a Delaware limited liability company with its principal place of business in New York.

80.     Plaintiff AIGGRE U.S. Industrial Chelsea II LLC is a Delaware limited liability company with its principal place of business in New York.

81.     Plaintiff AIGGRE Industrial Murray Hill III LLC is a Delaware limited liability company with its principal place of business in New York

10

82.     Plaintiff AIGGRE Industrial Chelsea III LLC is a Delaware limited liability company with its principal place of business in New York.

83.     Plaintiff AIGGRE Lincoln Chelsea I LLC is a Delaware limited liability company with its principal place of business in New York.

84.     Plaintiff AIGGRE Lincoln Murray Hill I LLC is a Delaware limited liability company with its principal place of business in New York.

85.     Plaintiff AIGGRE Murray Hill Loudon LLC is a Delaware limited liability company with its principal place of business in New York.

86.     Plaintiff AIGGRE Chelsea Loudon LLC is a Delaware limited liability company with its principal place of business in New York.

87.     Plaintiff AIGGRE Mexico Fund Murray Hill LLC is a Delaware limited liability company with its principal place of business in Georgia.

88.     Plaintiff AIGGRE Chelsea Middle East LLC is a Delaware limited liability company with its principal place of business in New York.

89.     Plaintiff AIGGRE Murray Hill Middle East LLC is a Delaware limited liability company with its principal place of business in New York.

90.     Plaintiff AIGGRE Chelsea Midwest Land Development LLC is a Delaware limited liability company with its principal place of business in New York.

91.     Plaintiff AIGGRE Murray Hill Midwest Land Development LLC is a Delaware limited liability company with its principal place of business in New York.

92.     Plaintiff AIGGRE NNP IV Chelsea, LLC is a Delaware limited liability company with its principal place of business in New York.

93.     Plaintiff AIGGRE NNP IV Murray Hill, LLC is a Delaware limited liability company with its principal place of business in New York.

94.     Plaintiff AIGGRE Murray Hill Nopal LLC is a Delaware limited liability company with its principal place of business in New York.

95.     Plaintiff AIGGRE Chelsea Nopal LLC is a Delaware limited liability company

11

with its principal place of business in New York.

96.    Plaintiff AIGGRE Chelsea OCNG LLC is a Delaware limited liability company with its principal place of business in New York.

97.    Plaintiff AIGGRE Murray Hill OCNG LLC is a Delaware limited liability company with its principal place of business in New York.

98.    Plaintiff AIGGRE Residential Murray Hill I LLC is a Delaware limited liability company with its principal place of business in New York.

99.    Plaintiff AIGGRE Residential Chelsea I LLC is a Delaware limited liability company with its principal place of business in New York.

100.   Plaintiff AIGGRE Residential Fund Murray Hill I LLC is a Delaware limited liability company with its principal place of business in New York.

101.   Plaintiff AIGGRE Residential Murray Hill II LLC is a Delaware limited liability company with its principal place of business in New York.

102.   Plaintiff AIGGRE Residential Chelsea II LLC is a Delaware limited liability company with its principal place of business in New York.

103.   Plaintiff AIGGRE Residential Murray Hill III LLC is a Delaware limited liability company with its principal place of business in New York.

104.   Plaintiff AIGGRE Residential Chelsea III LLC is a Delaware limited liability company with its principal place of business in New York.

105.   Plaintiff AIGGRE Residential Murray Hill IV LLC is a Delaware limited liability company with its principal place of business in New York.

106.   Plaintiff AIGGRE Residential Chelsea IV LLC is a Delaware limited liability company with its principal place of business in New York.

107.   Plaintiff AIGGRE Terrabrook Murray Hill I LLC is a Delaware limited liability company with its principal place of business in New York.

108.   Plaintiff AIGGRE Terrabrook Chelsea I LLC is a Delaware limited liability company with its principal place of business in New York.

12

109.    Plaintiff AIGGRE Trivest Murray Hill I LLC is a Delaware limited liability company with its principal place of business in New York.

110.    Plaintiff AIGGRE Trivest Chelsea I LLC is a Delaware limited liability company with its principal place of business in New York.

111.    Plaintiff AIGGRE West Murray Hill I LLC is a Delaware limited liability company with its principal place of business in New York.

112.    Plaintiff AIGGRE West Chelsea I LLC is a Delaware limited liability company with its principal place of business in New York.

113.    Plaintiff AIGGRE Chelsea West II LLC is a Delaware limited liability company with its principal place of business in New York.

114.    Plaintiff AIGGRE Murray Hill West II LLC is a Delaware limited liability company with its principal place of business in New York.

115.    Defendant AIG is a Delaware corporation with its principal executive offices at 70 Pine Street in New York, New York.

116.    Defendant AIGGRE is a Delaware corporation with its principal place of business at 277 Park Avenue in New York, New York.  Among other things, Plaintiffs bring this action against AIGGRE in its capacity as the general partner of the AIGGRE-sponsored funds and the managing member and/or general partner of the Chelsea and Murray Hill entities defined herein.

## JURISDICTION AND VENUE

117.    This Court has jurisdiction over the Defendants pursuant to C.P.L.R. § 302(a)(1) because Defendants transact business within the State of New York.

118.    Venue is proper pursuant to C.P.L.R. § 503(a) because Defendants AIG and AIGGRE reside in New York, New York.  Venue is also proper under the contracts governing various claims alleged herein, as the contracts provide that the claims shall be brought in a state or federal court located in New York, New York.

## NATURE OF THE ACTION

13

119. This direct and derivative action for breach of contract, breach of fiduciary duty, declaratory judgment, injunctive relief, specific performance, a constructive trust, and an accounting arises from a) Defendants' bad faith refusal to make distributions required under a contract executed by AIG and Mr. Fitzpatrick on April 13, 2001 (the "2001 Contract") and under various limited liability company and limited partnership agreements; and b) Defendants' misappropriation of funds owed to Fitzpatrick and the various limited liability companies and limited partnerships known as "Tribecas," "Murray Hills," and "Chelseas" which were formed as vehicles to distribute profit interests to Mr. Fitzpatrick and AIGGRE employees.

120. Over the course of twenty-two years, Mr. Fitzpatrick built AIGGRE from nothing; developed and managed AIG's and AIGGRE's real estate investments; and cultivated AIGGRE into a sophisticated global real estate investment business that contributed substantial profits to AIG. As President and CEO of AIGGRE, Mr. Fitzpatrick formed and oversaw sixteen real estate investment funds ("Funds"), which acquired and managed properties using equity contributed by AIG and third party investors, and acquired and managed myriad real estate investments in which AIG invested directly.

121. The terms of Mr. Fitzpatrick's employment as President and CEO of AIGGRE are set forth in the 2001 Contract. The 2001 Contract also establishes AIG's funding commitments for AIGGRE, grants Mr. Fitzpatrick various profit and partnership interests ("Profits Interests"), and provides for the creation of entities (known as the "Tribecas," "Murray Hills," and "Chelseas") to serve as vehicles for the distribution of the Profits Interests to Mr. Fitzpatrick and other AIGGRE employees. Under the 2001 Contract, Mr. Fitzpatrick is entitled to a share of profits derived from the Funds ("Fund Investments") and from AIG's real estate investments ("Direct Investments"). The 2001 Contract further provides that Profits Interests distributions shall be paid on a quarterly basis, no later than 30 days after Mr. Fitzpatrick's certification of the investments' financial statements.

122. Pursuant to the 2001 Contract, and after careful vetting by both AIG and outside legal and accounting professionals, AIG and Mr. Fitzpatrick executed fifty-three Tribeca

14

agreements ('Tribeca Agreements") between 2004 and 2008. The Tribeca Agreements create limited liability companies and/or limited partnerships for the purpose of distributing shares of Profits Interests owed to AIGGRE employees, including Mr. Fitzpatrick. The Tribeca Agreements also provide that the managing member or general partner of each Tribeca is an entity controlled by Mr. Fitzpatrick, KPF Management, Inc., Valley Trunk Holdings, LLC, and Navy Limited (collectively, the "KPF Management Companies"). The 2001 Contract also provided for the creation of entities known as "Sohos" that enabled Mr. Fitzpatrick to invest personal capital in Fund Investments. Additional entities known as "Chelseas" and "Murray Hills" (described in greater detail below) were also created for the purpose of facilitating the distribution of Profits Interests to the Tribeca and Soho entities. AIGGRE is the managing member or general partner of the Chelsea and Murray Hill entities and as such is responsible for distributing Profits Interests to the Tribeca and Soho entities.

123.    Beginning in or around October 2008, AIG refused to authorize the distribution of Profits Interests owed to Mr. Fitzpatrick and other AIGGRE employees, in violation of the 2001 Contract and the various Tribeca, Murray Hill, and Chelsea Agreements. To date, AIG has failed to make Profits Interests distributions to Mr. Fitzpatrick and other AIGGRE employees for the third and fourth quarters of 2008, and the first, second, and third quarters of 2009 in accordance with the 2001 Contract and Tribeca, Murray Hill, and Chelsea Agreements. AIG has indicated that it does not intend to pay these or any future Profits Interests distributions to Mr. Fitzpatrick and other AIGGRE employees as provided for in the relevant Agreements.

124.    Shortly after AIG refused to distribute Profits Interests from the third quarter of 2008, AIG substantially diminished Mr. Fitzpatrick's executive authority over the day-to-day operations of AIGGRE and thwarted his ability to properly manage AIGGRE's real estate assets. AIG excluded Mr. Fitzpatrick from important meetings and decisions regarding AIGGRE and Fund real estate assets, and placed authority over AIGGRE's daily operations in the hands of various consultants that lacked the global real estate expertise necessary to run AIGGRE. As such, AIG's actions were in direct violation of the 2001 Contract, which provides in Section 1(b)

15

that Mr. Fitzpatrick is entitled to exercise "full executive authority over the day-to-day operations of [AIGGRE] and the management of any Funds."

125. Moreover, as described in greater detail below, under Section 4(c) of the 2001 Contract, Mr. Fitzpatrick was entitled to terminate his employment for "Good Reason" if a) his duties, titles or responsibilities under the 2001 Contract were diminished; or b) AIG committed a material breach of the 2001 Contract. Faced with clear violations of the 2001 Contract and serious diminution of his responsibilities and duties at AIGGRE, Mr. Fitzpatrick submitted a Letter of Resignation for Good Reason on March 25, 2009. Although Section 4(c) of the 2001 Contract provided AIG with a period of 30 business days in which to cure its breaches, AIG failed to do so.

126. Accordingly, Mr. Fitzpatrick and the KPF Management Companies, individually and derivatively on behalf of the Tribecas, Sohos, Murray Hills, and Chelseas bring this action against Defendants AIG and AIGGRE for:

a) damages resulting from Defendants' failure to distribute and misappropriation of Profits Interests from the third and fourth quarters of 2008 and the first, second, and third quarters of 2009, in violation of the 2001 Contract and the Tribeca, Chelsea, Murray Hill, and Soho Agreements;

b) damages resulting from AIG's failure to distribute and misappropriation of Profits Interests resulting from the May 11, 2009 sale of a property known as the Otemachi Building in Tokyo, in violation of the 2001 Contract;

c) a declaratory judgment that Mr. Fitzpatrick and the KPF Management Companies are entitled to future Profits Interests arising from Direct Investments and Fund Investments, as defined by the 2001 Contract;

d) a declaratory judgment and judgment for specific performance, declaring and ordering that AIG shall provide Mr. Fitzpatrick with AIG "early retirement" benefits, as provided for in the 2001 Contract, including the ability to purchase AIG medical insurance at employee rates for life;

16

e) a declaratory judgment that the Tribecas, Sohos, Murray Hills, and Chelseas are entitled to future Profits Interests arising from Direct Investments and Fund Investments, as defined by the 2001 Contract;

f) damages resulting from AIG's and/or AIGGRE's failure to distribute Profits Interests, and misappropriation of Profits Interests, owed to Mr. Fitzpatrick and the KPF Management Companies, in breach of AIG's and/or AIGGRE's fiduciary duties as managing member of the Tribecas, Murray Hills, and Chelseas;

g) damages resulting from AIGGRE's failure to distribute Profits Interests and misappropriation of Profits Interests owed to the Chelsea, Murray Hill, and Tribeca entities, in breach of AIGGRE's fiduciary duties as managing member of the entities;

h) damages resulting from AIGGRE's failure to distribute Profits Interests in accordance with the Tribeca, Murray Hill, and Chelsea Agreements;

i) an injunction and specific performance 1) ordering the removal of AIGGRE and/or as the managing member of the Chelsea, Murray Hill, Soho, and Tribeca entities and appointing a receiver; 2) ordering that all Profits Interests distributions currently in accounts controlled by AIG or AIGGRE be distributed to the appropriate Chelsea, Murray Hill, Soho, and Tribeca accounts; 3) ordering that all Profits Interests distributions diverted from accounts controlled by AIG or AIGGRE be returned and distributed immediately; 4) enjoining AIG and AIGGRE from transferring future Profits Interests distributions except in strict compliance with the terms of the applicable Chelsea, Murray Hill, Tribeca, and Soho Agreements;

j) an order imposing a constructive trust over all future Profits Interests (including the Reserves and Unallocated Amounts, as described herein) to ensure the Profits Interests distributions are made in accordance with the Tribeca, Soho, Murray Hill and Chelsea operating agreements and the 2001 Contract; and

17

k)      judgment for an accounting (including determining the valuation of the AIGGRE portfolio, and the valuation of Profits Interests distributions owed to Chelsea, Murray Hill, Tribeca, and Soho entities).

## FACTUAL ALLEGATIONS

**A.      Mr. Fitzpatrick, a Seasoned Real Estate Executive, Builds and Develops a Global Real Estate Business for AIG from the Ground Up.**

127.    In 1987, AIG recruited Kevin Fitzpatrick to develop and manage a real estate business with a focus on investing insurance company funds in commercial real estate assets and manage commercial real estate loans. Mr. Fitzpatrick was, at the time, already a seasoned real estate executive with a proven track record at Metropolitan Life Insurance Company. Within a year, Mr. Fitzpatrick created two new companies, one of which focused on commercial mortgage lending (and was later folded into AIG's Fixed Income division), and another which focused on real estate investment and which is now AIGGRE.

128.    At the time that Mr. Fitzpatrick joined AIG the company effectively had no commercial real estate investment business. AIG hired Mr. Fitzpatrick to create that business, initially providing him with little more than an office and a computer.

129.    Beginning in 1987, Mr. Fitzpatrick recruited a team of real estate professionals and, over the next twenty-two years, grew AIG's real estate business into a highly sophisticated and wildly profitable venture.

130.    During the late 1980s and early 1990s, Mr. Fitzpatrick developed a commercial lending business for AIGGRE. He then quickly moved to identifying equity investments in which AIG acquired properties for profitable development, management, and sale. Mr. Fitzpatrick also assumed responsibility for managing AIG real estate investments, such the Shanghai Center in China, which was one of the largest American investments in China at the time.

131.    As Mr. Fitzpatrick grew AIG's real estate franchise, AIG came to rely on Mr. Fitzpatrick's expertise in connection with real estate matters derived from all aspects of AIG's

business, including lending and insurance. For example, in the early 1990s AIG called upon Mr. Fitzpatrick to convert a potential loss on the insurance side of AIG's business – a fire damaged hotel in San Juan, Puerto Rico – into a profitable real estate investment. Mr. Fitzpatrick engineered the development of the property into a highly successful resort and casino that continues to generate profits for AIG to this day.

132.   In addition, AIG asked Mr. Fitzpatrick to acquire and manage certain properties that housed AIG's business operations. Mr. Fitzpatrick's expertise allowed AIG to raise its profile in the business world by acquiring and affixing the AIG name to prominent properties. Mr. Fitzpatrick also ensured the acquisition of facilities at the lowest possible cost, and achieved remarkable success. For example, in the early 1990s, he sourced the purchase of 160 Water Street in New York City, after tax concessions had been obtained that effectively enabled AIG to acquire the building at zero cost.

**B.      Impressed with Mr. Fitzpatrick's Success, AIG Executes a 2001 Contract with Mr. Fitzpatrick as Part of AIG's Plan to Develop a Real Estate Investment Fund Business.**

133.   During the early to mid 1990s, in addition to managing and sourcing AIG's real estate investments, Mr. Fitzpatrick began to expand AIG's real estate operations with the formation of real estate investment funds. In general, these funds sought to acquire, develop and manage a portfolio of properties, and eventually sell them, with the profits distributed to fund shareholders.

134.   In 1995, Mr. Fitzpatrick guided the formation of the fund Property Mezzanine Partners ("PMP") for the purpose of investing in commercial and industrial properties in the United Kingdom, and in 1998 he formed the AIG French Property Fund, B.V. ("FPF"), for the purpose of investing in distressed commercial real estate in Paris. Both funds were highly successful and substantially exceeded initial targeted returns.

135.   As AIG urged Mr. Fitzpatrick and his management team to expand the development of the real estate investment fund business, Mr. Fitzpatrick concluded that AIG's

ability to raise capital from third parties would be drastically impaired if fund management was not entitled to a share of the funds' profits. This was because investors wanted to be assured that the fund management team's interests would be aligned with the funds' investors. Moreover, AIGGRE simply could not compete with other funds that offered their professionals interests in fund profits without offering the same incentive.

136.    Providing employees and managers of real estate investment funds with a share of fund profits was at the time, and continues to be, a standard market practice. . Accordingly, AIG and Mr. Fitzpatrick agreed that AIGGRE would be at a serious competitive disadvantage in raising third-party capital and that its real estate investment fund business strategy would not succeed unless Mr. Fitzpatrick and his management team were granted an interest in the profits generated from the real estate investments they managed. As a consequence, AIG and Mr. Fitzpatrick engaged in a series of negotiations regarding the structure of AIG's real estate investment fund business and the terms of Mr. Fitzpatrick's future role as the manager of that business.

137.    Thus, as part of its strategy to develop a real estate investment fund business at AIGGRE, AIG executed a contract with Mr. Fitzpatrick on April 13, 2001 (the "2001 Contract"). (A true and correct copy of the 2001 Contract is attached hereto as Exhibit A.) The 2001 Contract was executed after extensive negotiations involving legal counsel extending over several months. The 2001 Contract was reviewed and approved by legal counsel for both parties and AIG's management.

### C.    The Terms of the 2001 Contract.

138.    The 2001 Contract establishes (1) AIG's obligations to AIGGRE; (2) the terms of Mr. Fitzpatrick's employment as President of AIGGRE; and (3) the terms of the various partnership and profit interests granted to Mr. Fitzpatrick under the Contract.

> *1.    AIG Grants Mr. Fitzpatrick Partnership and Profits*
> *Interests under the 2001 Contract.*

139.    Section 3(b) of the 2001 Contract grants Mr. Fitzpatrick various profit interests in

AIG's real estate investments (collectively, "Profits Interests").

140.    Section 7(i) of the 2001 Contract expressly provides that "the Profits Interests are not intended to be compensation to [Mr. Fitzpatrick], and AIG agrees that they will be treated for all purposes not to be such."

141.    Pursuant to the 2001 Contract, Mr. Fitzpatrick's Profits Interests include interests in the profits arising from: (1) AIGGRE-sponsored real estate investment funds ("Funds" or "Fund Investments"); and (2) AIG's real estate investments ("Direct Investments").   The specifics of the Profits Interests are addressed in greater detail below.

142.    In general, as described earlier, Fund Investments involved the acquisition (through capital provided primarily by outside investors, as well as AIG capital) of commercial properties for inclusion in a portfolio of such properties, and the subsequent management, development, and sale of those properties for profit.  Under Sections 3(b)(iii) and (iv) of the 2001 Contract, Mr. Fitzpatrick is entitled to Profits Interests arising from Fund Investments occurring both before and after the execution of the 2001 Contract.

143.    Direct Investments involved the use of AIG capital to purchase properties for AIG and its affiliates, either for use by AIG, or for profitable management, development, and eventual sale for the benefit of AIG.

144.    The 2001 Contract recognized Profits Interests derived from two types of Direct Investments – those consummated after the effective date of the 2001 Contract, and those in place before the effective date of the 2001 Contract.  Under Section 3(b)(i) and (ii) of the 2001 Contract, Mr. Fitzpatrick was entitled to Profits Interests from both types of Direct Investments.

145.    Each Fund and Direct Investment was developed and managed by Mr. Fitzpatrick, either through AIGGRE or an AIGGRE affiliate.

146.    In exchange for receiving the Profit Interests granted under the 2001 Contract, Mr. Fitzpatrick relinquished his claims to future equity grants of AIG shares, future grants of stock options, future equity grants in Starr International Company, Inc. ("SICO"), and his limited partnership position in C.V. Starr & Co. ("C.V. Starr").  (SICO and C.V. Starr were equity-based

21

deferred compensation programs used by AIG to attract and retain highly qualified executives.) Mr. Fitzpatrick agreed to these major concessions because AIG, with the full knowledge and approval of AIG's senior management including AIG's Vice Chairman, AIG's Chief Investment Officer, AIG's Compensation Committee, and AIG's legal department, agreed to make Mr. Fitzpatrick and his management team partners in AIG's and AIGGRE's real estate investments and transactions.

a.  Fund Investments

147.  During Mr. Fitzpatrick's 22-year tenure at AIG, AIGGRE sponsored approximately sixteen Funds.  Each Fund had a specific geographic focus and risk profile. AIGGRE has sponsored Funds for real estate investments in the geographical regions including the United States, Mexico, Europe, Japan, Asia, India, and South Korea.  The Funds sponsored by AIGGRE during Mr. Fitzpatrick's tenure include the following:

| Fund | Geographic Focus | Year Established |
|------|------------------|------------------|
| Property Mezzanine Partners ("PMP") | Europe – United Kingdom | 1995 |
| AIG French Property Fund, B.V. ("FPF") | Europe – France | 1998 |
| AIG European Real Estate Partners, L.P. ("Europe Fund") | Europe | 2001 |
| AIG European Real Estate Partners II, L.P. ("Europe II") | Europe | 2008 (date of closing) |
| AIG U.S. Residential Real Estate Partners, L.P. ("U.S. Residential Fund") | North America – United States | 2004 |
| AIG Real Estate Opportunity VIII - Mexico L.P. ("Mexico Fund") | North America – Mexico | 2005 |
| Prime Property Program ("PPP") | Asia – Japan | 2005 |
| Prime Property Program II ("PPP II") | Asia – Japan | 2006 |
| AIG Japan Real Estate Y.K. ("Japan Fund") | Asia – Japan | 2002 |
| AIG Japan Real Estate Value Added II Y.K. ("Japan Fund II") | Asia – Japan | 2005 |
| AIG Japan Real Estate V.A. III, Y.K. ("Japan Fund III") | Asia – Japan | 2006 (date of closing |
| AIG Asian Real Estate Partners, L.P. ("Asia Fund") | Asia | 2001 |
| AIG Asian Real Estate Partners II, L.P. | Asia | 2008 |

| ("Asia II") | | |
|---|---|---|
| AIG Real Estate Opportunity - India, L.P. ("India Fund") | Asia – India | 2008 (date of closing) |
| AIG Real Estate Opportunity X – South Korea, L.P. | Asia – South Korea | (in or before 2007) |
| AIG International Real Estate GmbH & Co. KGaA ("AIRE") | Global | 2002 (year of IPO) |

148.   Section 3(b) of the 2001 Contract establishes the method for calculating Mr. Fitzpatrick's Profit Interests from Fund Investments.  Under Section 3(b)(iii), Mr. Fitzpatrick and other key employees (collectively referred to as "Principals" in the 2001 Contract) are entitled to receive a percentage of the "carried interest" in the Funds, which is a portion of the profits generated by each Fund Investment.

149.   Exhibit 2 to the 2001 Contract establishes the Principals' share of the carried interest for any given Fund Investment, and provides that the percentage of the carried interest payable to the Principals (including Mr. Fitzpatrick) depends on whether the carried interest is attributable to profits generated from third party capital or from AIG's direct capital contributions.  Pursuant to Exhibit 2, the Principals' share of the carried interest is higher for profits attributable to third party capital than for profits attributable to AIG capital, and in both instances, the Principals' percentage share of the carried interest increases with the gross return of the Fund.

150.   The 2001 Contract also establishes the method to be used in dividing the Principals' share of the carried interest amongst Mr. Fitzpatrick and the remaining Principals. Pursuant to Section 3(b)(v) and Exhibit 3, Mr. Fitzpatrick is entitled to 18% of the Principals' share of the carried interest.  With respect to the remainder of the Principals' share of the carried interest, and in accordance with Exhibit 3, a portion is allocated to the Fund manager, a portion is allocated to a bonus pool, and the remainder is designated as "Unallocated Amounts."

151.   Pursuant to Exhibit 3, the Unallocated Amounts are to be distributed to AIGGRE management and employees based on the recommendation of the president of AIGGRE and subject to the approval of AIG's Chief Investment Officer ("CIO").

152.   As manager of the Funds, AIGGRE is responsible for distributing the "carried interest" Profits Interests to which Mr. Fitzpatrick and other Principals are entitled under the 2001 Contract.

### b.   Direct Investments

153.   Pursuant to Section 3(b)(i) of the 2001 Contract, after AIG receives a preferred return of 8% on Direct Investments, 10% of any additional profits are allocated to Mr. Fitzpatrick and the other Principals.

154.   Exhibit 1 to the 2001 Contract provides the methodology for dividing the 10% Principals' share between Mr. Fitzpatrick and the other Principals. In that regard, Mr. Fitzpatrick is entitled to 50% of the Principals' share, and the remaining 50% allocated to the Principals is allocated between the bonus pool and the Unallocated Amounts.

155.   As with Fund Investments, the Unallocated Amounts are to be allocated among AIGGRE employees and management based on the recommendation of the president of AIGGRE and the approval of AIG's CIO.

### c.   Tax Distributions and Reserve Amounts

156.   Section 3(b)(i) provides that the financial statements of entities formed for the purpose of distributing the Profits Interests (such entities are discussed in further detail below) must be provided to AIG and the AIG CIO on a quarterly basis, and that Mr. Fitzpatrick shall make a reasonable good faith certification as to the fair market value of the Direct Investments on an annual basis and certain other financial calculations on a quarterly basis. The 2001 Contract provides in Section 3(b)(x) that Mr. Fitzpatrick's Profits Interests shall be paid on a quarterly basis, "no later than 30 days after the delivery of the quarterly certification contemplated in the last sentence of Section (3)(b)(i)."

157.   The 2001 Contract further provides in Sections 3(b)(vii) and (viii) that Mr. Fitzpatrick and other Principals are, on a quarterly basis, entitled to a "tax distribution" to satisfy any tax obligations arising from a real estate transaction. The tax distribution is a payment of the portion of the Profits Interests owed to a Principal and is not a payment in addition to the Profits

Interests.

158.   The 2001 Contract provides that the Profits Interests shall be subject to a "clawback" under certain circumstances. In order to facilitate the fulfillment of clawback obligations, the 2001 Contract provides that, after a Principal's tax distribution is paid, 50% of a Principal's remaining distribution shall be placed in a reserve account (the "Reserve Amounts"). AIGGRE is required to hold the Reserve Amounts for future distribution, and the Reserve Amounts must be distributed to Mr. Fitzpatrick and the other Principals after any clawback obligations are satisfied.

159.   Thus, on a quarterly basis, Mr. Fitzpatrick and other Principals were entitled to (1) a tax distribution; (2) a distribution of their share of the Profits Interests, less the Reserve Amount; and (3) 8% interest on the Reserve Amounts and default interest for any late distributions. Mr. Fitzpatrick and the other Principals are also entitled to the Reserve amounts when such amounts are ultimately released in accordance with the relevant Agreements.

### 2.   AIG Agrees to Provide Capital Commitments to Real Estate Investment Funds.

160.   The 2001 Contract provides in Section 2 that AIG will make capital commitments for Direct Investments in both domestic and international real estate assets, and that AIG will sponsor Funds for the same purpose.

161.   Specifically, AIG agreed to sponsor specific real estate opportunity Funds (Europe, South America, Asia, and Global) under Section 2(c) of the 2001 Contract, and to provide capital in an amount equal to 10% of the total capital committed by third party investors to those Funds. These initial capital commitments were gradually increased and expanded by AIG over the ensuing years as AIGGRE flourished under Mr. Fitzpatrick's management. Under Section 2(a) of the 2001 Contract, AIG also agreed to provide a $100 million line of credit (called a "warehousing facility") to be used to acquire real estate in Europe, South America, and Asia, which in turn would be transferred to an appropriate Fund.

162.    Additionally, under Section 2(b) of the 2001 Contract, AIG committed to invest at least $300 million in cash and another $150 million per year in direct and indirect U.S. real estate investments.

### 3.    Termination Provisions.

163.    The 2001 Contract recognizes the highly sophisticated nature of Mr. Fitzpatrick's duties and the necessity of granting the President of AIGGRE the executive authority necessary to effectively establish and manage a competitive global real estate investment platform for AIG. Specifically, Section 1 of the 2001 Contract establishes that Mr. Fitzpatrick, effective as of January 1, 2000, would continue to serve as the senior-most executive at AIGGRE, with duties and responsibilities including "full executive authority over the day-to-day operations of AIG GREIC and the management of any Funds" and the development of AIGGRE's business plan.

164.    The 2001 Contract further provides, in Section 4, that Mr. Fitzpatrick's employment as President of AIGGRE can only be terminated under four discrete circumstances: (a) "Termination Due to Death or Disability;" (b) "Termination by the Company for Cause;" (c) "Termination by [Mr. Fitzpatrick];" and (d) "Normal Retirement."

165.    Pursuant to Section 4(c) of the Contract, Mr. Fitzpatrick has the right to terminate his employment as President of AIGGRE either without "Good Reason" upon 90 days' written notice, or for "Good Reason."   "Good Reason" is defined as the occurrence, without Mr. Fitzpatrick's consent, "of any of the following events: (i) the assignment of duties, titles or responsibilities that are different from, and that result in a diminution of, the duties, titles and responsibilities described herein; or (ii) a material breach by AIG of any of its obligations hereunder."   Section 4(b) further provides that Mr. Fitzpatrick is entitled to resign for Good Reason if, upon delivering written notice to AIG of his intention to terminate his employment for Good Reason, AIG has not cured its breaches within 30 business days.

166.    Pursuant to Section 4(b) of the Contract, AIG is permitted to terminate Mr. Fitzpatrick's employment (absent death or disability) only upon 90 days' prior written notice

26

without "Cause," or "for Cause."  Section 4(b) of the Contract specifically defines Cause as: "(i) willful and material failure to perform your duties hereunder (other than any such failure due to physical or mental illness) after prior written notice is given to you and you have not cured such circumstance within 20 days of receiving such notice, (ii) your engaging in gross negligence, willful misconduct or significant breach of fiduciary duty that is injurious to AIG or any AIG Company or any Fund or (iii) you having been convicted of, or entered a plea of guilty or nolo contendere to a crime that constitutes a felony or a material violation of United States or non-U.S. federal or state securities laws on any rule or regulation promulgated thereunder or (iv) the commission by you of fraud, embezzlement, or a similar cause of action."

### D. Distribution of Profits Interests Through the Tribeca, Murray Hill, Chelsea, and Soho Entities.

#### 1. The Tribeca Structure.

167.    The 2001 Contract provides for the creation of limited liability companies and limited partnerships (known as "Tribecas" or "Tribeca entities") as vehicles for the distribution of Profits Interests granted to Mr. Fitzpatrick and the other Principals.  The Contract states in Section 3(b)(i): "the Principals shall be admitted as limited partners or members of the partnership, limited liability company or other similar entity that holds a Direct Investment, and shall receive a 'partnership interest' in such entity that will entitle them to receive such share of the profits realized on such investments as 'partners.'"  Section 3(b)(i) also authorizes Mr. Fitzpatrick to collaborate with the AIG Law and Tax Departments to establish the organizational structure pursuant to which the Profits Interests would be distributed to Mr. Fitzpatrick and others. Section 3(b)(iii) provides that "[e]ach fund shall be organized in a manner that permits the Principals to receive their respective shares in the carried interest as "partners" for U.S. federal income tax purposes (or a similar tax-advantaged manner in the case of managers on an international Fund who are not U.S. taxpayers)."

168.    Following the execution of the 2001 Contract and pursuant to that Contract, Mr. Fitzpatrick and AIG engaged in extensive efforts to identify the optimal organizational structure

27

for the purpose of distributing Profits Interests to Mr. Fitzpatrick and other Principals with the greatest allowable after-tax benefit. The structure that was ultimately approved is known as the "Tribeca structure." Prior to approving the Tribeca structure, Mr. Fitzpatrick and/or AIG consulted AIG's Legal and Tax Departments, an independent accounting firm, and outside legal counsel, for the purposes of ensuring compliance with United States and foreign tax laws and regulatory requirements.

169. Under the Tribeca structure, Mr. Fitzpatrick and other Principals receive distributions of Profits Interests through the Tribeca entities. Additionally, entities known as "Murray Hill" and "Chelsea" entities serve as a mechanism to distribute profits to the Tribeca entities. The interaction of the Tribeca, Murray Hill, and Chelsea entities is discussed in greater detail below.

170. Under Section 3(b)(x) of the 2001 Contract, upon the sale, disposition, or restructuring of a real estate investment, the Principals' share of profits realized from such a transaction must be transferred to the designated Tribeca entity within 30 days of certification of the calculation of the Profits Interests by AIG's CIO.

171. AIG's contractual obligations to distribute Profits Interests to Mr. Fitzpatrick arise under the 2001 Contract, and the creation of a Tribeca entity (or corresponding Murray Hill or Chelsea entities) is not a pre-condition for the distribution of any of Mr. Fitzpatrick's Profit Interests. Indeed, on numerous occasions, AIG paid Profits Interests distributions to Mr. Fitzpatrick where no Tribeca entity was in place.

172. Although Tribecas are not necessary for the distribution of Mr. Fitzpatrick's Profits Interests, following the execution of the 2001 Contract, fifty-three Tribeca entities were formed for the purpose of facilitating distribution of the Profit Interests. Pursuant to the 2001 Contract, Mr. Fitzpatrick or entities controlled by him, including Plaintiffs KPF Management, Inc., Navy Limited, and Valley Trunk Holdings, LLC (collectively, the "KPF Management Companies") were named as the managing member or general partner of each Tribeca.

173. Each Tribeca structure, and the associated pooling of assets for Direct

28

Investments, was expressly approved by AIG's CIO. The documentation for the Tribeca structure was also approved by AIG's Legal, Tax, and Accounting Departments; the law firms of Morris Manning LLP (as counsel to AIGGRE); Paul Weiss LLP (as counsel to AIG Global Investments Group ("AIGGIG"); Clifford Chance (as counsel to AIG); and by Ernst & Young. The Tribeca structure differed slightly as between Direct Investments and Fund Investments, as described below.

a.   <u>Direct Investments.</u>

174. For purposes of Direct Investments, AIGGRE would create a Chelsea entity for the purpose of owning AIGGRE's interest in the real estate asset. In the typical Direct Investment, AIGGRE would own the real estate asset in partnership with outside investors and/or real estate development companies through joint ventures. The Chelsea entity would have a membership interest in the joint venture and would be entitled to AIGGRE's share of the profits from the sale of any real estate owned by the joint venture.

175. AIGGRE would serve as the managing member of the Chelsea entity, and another entity (called a "Murray Hill entity") would also be a member of the Chelsea entity. As managing member of the Chelsea entity, AIGGRE would be responsible for distributing AIGGRE's share of the profits from the Direct Investment to the members of the Chelsea entity pursuant to the Chelsea operating agreement.

176. AIGGRE was also typically the managing member of the Murray Hill entity that received a distribution of a share of the profits from the Direct Investment from the Chelsea entity. A third entity, called a "Tribeca entity," would also be a member of the Murray Hill entity. Again, as the managing member of the Murray Hill entity, AIGGRE was responsible for distributing profits to the Tribeca entity according to the terms of the Murray Hill operating agreement.

177. The Tribeca entities would then distribute profits to its members, which included Mr. Fitzpatrick and the other Principals (or entities owned by them). Through the foregoing "waterfall" structure, the Principals received their respective Profits Interests in accordance with

29

the terms of the 2001 Contract.

178.   A simplified schematic illustrating the flow of profits through the Tribeca structure for Direct Investments is set forth below:



b.   Fund Investments.

179.   With respect to Fund Investments, the general partner of the Fund would typically be owned by a Murray Hill entity (usually a limited liability company or limited partnership), and AIGGRE would serve as the managing member or general partner of the Murray Hill entity. A Tribeca entity would have a membership or limited partnership interest in the Murray Hill entity.

180.   As the general partner (or managing member) of the Murray Hill entity, AIGGRE would cause the Murray Hill entity to distribute the Principals' share of Profits Interests arising from the funds (i.e., the carried interest) to the Tribeca entity, which was then distributed to the

Principals (who were members or partners in the Tribeca entities) in accordance with the terms of the 2001 Contract.

181.   A simplified schematic illustrating the flow of profits through the Tribeca structure for Fund Investments is set forth below:



2.   *The Soho Entities.*

182.   The 2001 Contract provides that Mr. Fitzpatrick and other eligible AIG employees would be permitted to invest personal capital alongside any Direct Investments or Fund Investments. Specifically, Section 6 of the 2001 Contract provides that AIG will establish a "parallel investment vehicle" to enable such investment without requiring Mr. Fitzpatrick and other eligible employees to pay AIG's management fee or carried interest. In connection with this contractual provision, AIG approved the formation of limited liability companies and limited partnerships known as "Soho Entities" through which Mr. Fitzpatrick invested personal capital in

Direct Investments and Fund Investments.

183.    When Mr. Fitzpatrick invested personal capital in an AIGGRE-sponsored Fund, a corresponding Soho Agreement was created, providing Mr. Fitzpatrick with a limited partnership interest in a particular Fund, and providing for the distribution of Mr. Fitzpatrick's share of profits attributable to his personal capital.  Mr. Fitzpatrick invested personal capital in several AIGGRE-sponsored Funds, including those referred to as Japan I, Japan II, Japan III, Residential I, Asia I, Mexico, Europe I and South Korea.

### E.    Mr. Fitzpatrick Continues to Build AIGGRE into a Leading Global Real Estate Business in the Wake of the 2001 Contract.

184.    Following the execution of the 2001 Contract, Mr. Fitzpatrick continued to build AIGGRE.  Under Mr. Fitzpatrick's management, AIGGRE grew to become one of the largest, most successful, and well-diversified global real estate management businesses in the world. AIGGRE became recognized internationally as a sophisticated and distinguished real estate investor, having invested billions of dollars in real estate assets for AIG, the AIG insurance companies, and third party investors.

185.    Through Mr. Fitzpatrick's leadership, AIGGRE generated billions of dollars in profit for AIG and the AIG insurance companies, ultimately making AIG more competitive in the insurance market.

186.    AIGGRE consistently contributed profits to AIG by earning fees on Fund Investments and by enabling AIG to earn higher returns on its real estate portfolio.  Indeed, the AIGGRE real estate funds founded and managed by Mr. Fitzpatrick were uniformly successful, routinely generating returns for investors of 25-40%, and often significantly higher.

187.    Through Mr. Fitzpatrick's careful and effective guidance, AIGGRE acquired interests in and managed hundreds of buildings globally, as AIG Direct Investments and as AIGGRE-sponsored Fund Investments.  Mr. Fitzpatrick also acquired and managed investments in buildings used as facilities by AIG, enabling the AIG insurance companies to earn higher returns and increase market presence and brand recognition, in part by placing AIG signage on

32

prominent buildings globally.

188.   Moreover, Mr. Fitzpatrick and his team showed extraordinary dedication to AIG and AIGGRE, working long hours and traveling extensively to develop AIGGRE's real estate portfolio.  Mr. Fitzpatrick and members of his team often traveled at significant personal risk to emerging markets where rule-of-law is not well-established and where kidnapping is not uncommon.

**F.     AIG Attempts to Seize Control of AIGGRE and Disregard the 2001 Contract.**

189.   By 2007, as noted above, AIGGRE had achieved phenomenal success, and ranked among the most prized units in AIG's extensive business operations.  That success, and the attendant profits, prompted efforts by AIG to seize control over AIGGRE, and thereby breach the 2001 Contract.

190.   In or about September 2007, Jeffrey Hurd, then-Chief Administrative Officer of AIG Investments, advised Mr. Fitzpatrick that members of the accounting and legal teams would no longer be permitted to receive Profits Shares distributions, despite the fact that the legal team's share had already been calculated and approved by Win Neuger, AIG's CIO.  AIG threatened to withhold approval of all Profits Interests unless all payments to the domestic legal team were discontinued.

191.   Later, in or around April 2008, Mark Lin, an employee in the AIG Investments Human Resources Department, prepared a report attempting to discredit the Tribeca structure and questioning the internal controls that were in place.  Lin's report was riddled with inaccuracies, and a transparent effort to justify AIG's illegal and improper efforts to seize control of AIGGRE and abrogate the 2001 Contract.

192.   Hurd also informed Mr. Fitzpatrick that new Tribeca Agreements would not be executed unless Mr. Fitzpatrick and the Tribecas ceded more control to AIG – a demand that violated the terms of the 2001 Contract.  Hurd's demand was particularly inexplicable, given that Hurd himself had been intimately involved in the creation and recommendation of the Tribeca

structure four years earlier in 2004. Hurd further advised Mr. Fitzpatrick that AIG had unilaterally decided that it would no longer permit Mr. Fitzpatrick to investment through the Soho entities, in breach of the 2001 Contract.

193. AIG's attempts to seize control of AIGGRE and violate the 2001 Contract predictably led to contentious exchanges between Mr. Fitzpatrick, Hurd, and Neuger in the first and second quarters of 2008. During those discussions, Mr. Fitzpatrick steadfastly refused any changes that would breach or otherwise violate the 2001 Contract. In response, Hurd and Neuger bluntly informed Mr. Fitzpatrick that AIGGRE employees could not enforce the 2001 Contract without losing their jobs, and would not dare to make that sacrifice. Therefore, according to Hurd and Neuger, AIG essentially had a license to make whatever changes it wanted to the 2001 Contract. Indeed, AIG's contempt for the contractual rights of the AIGGRE employees – employees that had done nothing but earn profits for AIG for years – was so pronounced that Hurd dismissively informed Mr. Fitzpatrick, in words or substance, that it was AIG's position that "contracts are made to be broken."

**G.    AIG Stonewalls Payment of Profits Interests and Strips Mr. Fitzpatrick of His Duties and Responsibilities as President of AIGGRE.**

194. On September 15, 2008, AIG's credit rating was downgraded following two consecutive quarters of losses attributable to, among other dubious practices, controversial credit default swap activities engaged in by AIG's Financial Products unit. This downgrade in AIG's credit rating triggered an obligation for AIG to provide additional collateral to its trading counter-parties, and thereby precipitated a severe liquidity crisis for AIG on September 16, 2008.

195. On September 16, 2008, Congress authorized the Federal Reserve Bank of New York to provide AIG with a secured credit facility of up to $85 billion to enable AIG to meet its obligations to provide additional collateral to credit default swap trading partners. Since that time, AIG has received additional loans and debt relief from the federal government, for a total bailout package valued in excess of $150 billion. As AIG has acknowledged, its liquidity crisis

34

was directly attributable to, *inter alia*, trading in credit derivatives by AIG's Financial Products unit. The work performed by Mr. Fitzpatrick and his real estate team and the profits achieved thereby were not related to and were completely separate from the trading performed by AIG's Financial Products unit.

196.    Thereafter, from approximately September 2008 through Mr. Fitzpatrick's departure in May 2009, AIG and AIGGRE repeatedly breached the 2001 Contract and the related agreements pertaining to distribution of profits by (a) refusing to distribute Profits Interests, and (b) depriving Mr. Fitzpatrick of his lead managerial role in AIGGRE and the Tribecas.

*1.    Refusal to Pay and Misappropriation of Profits Interests.*

197.    In or aroundOctober 2008, AIGGRE submitted its calculation of Profits Interests for the third quarter of 2008 to AIG's CIO, Win Neuger, in accordance with the established procedures described herein. Also in or around October 2008, Mr. Neuger approved the Profits Interests distributions  following a review of the submissions by the investment accounting team at AIG Investments. At the same time, Mr. Neuger and AIG relented in their earlier efforts to force changes to the Tribeca structure.

198.    On March 16, 2009, Mr. Neuger approved the distribution of Profits Interests for the fourth quarter of 2008, pursuant to established procedures and after review by the AIG investment accounting team.

199.    Despite   the   foregoing   approvals,   and   despite   Defendants'   repeated acknowledgments that the Profits Interests payments are due and owing, to date Defendants have refused to make the required Profits Interests distributions in accordance with the relevant Agreements, citing a seemingly endless stream of trumped up review and approval requirements.

200.    During the fourth quarter of 2008 and the first and second quarters of 2009, AIG also undermined Mr. Fitzpatrick's authority as managing member of the Tribecas, and repeatedly prevented Mr. Fitzpatrick from carrying out his duty to distribute Profits Interests under the Tribeca Agreements.

201.   For example, AIG attempted to coerce Mr. Fitzpatrick to breach his fiduciary duties to the Tribecas by demanding that he divert Tribeca funds (i.e., Profits Interests due to AIGGRE employees) to AIG. Mr. Fitzpatrick, of course, refused to do so.

202.   Moreover, in March 2009 Kevin Dibble, a Vice President of AIG Investments, at the direction of Anastasia Kelly, AIG's General Counsel, attempted via e-mail to transfer signatory authorization over the Tribeca bank accounts from Mr. Fitzpatrick to Kelly without Mr. Fitzpatrick's consent, in violation of the terms of the Tribeca Agreements and the 2001 Contract.

203.   In connection with the foregoing conduct, AIG has failed to pay Mr. Fitzpatrick Profits Interests distributions from the third and fourth quarters of 2008 and the first, second, and third quarters of 2009, and has provided no indication that it intends to pay these or any future distributions of vested Profits Interests. AIG has no basis whatsoever to refuse payment of these distributions.

204.   In addition, upon information and belief, AIGGRE, as managing member of the Chelsea and Murray Hill entities, is improperly holding funds at the Chelsea and/or Murray Hill levels rather than making the distributions required under the Chelsea, Murray Hill, Tribeca, and 2001 Contracts, in violation of its contractual obligations and fiduciary duties to Mr. Fitzpatrick, the KPF Management Companies, and the Tribeca entities.

205.   Upon information and belief, AIGGRE, as managing member of the Chelsea and Murray Hill entities, has also improperly transferred funds from those entities to the coffers of AIG and/or AIGGRE, in violation of its contractual obligations and fiduciary duties to Mr. Fitzpatrick, the KPF Management Companies, and the Tribeca entities. This conduct essentially constitutes a theft of funds belonging to Mr. Fitzpatrick and other AIGGRE employees, including funds for which Mr. Fitzpatrick and others have already paid taxes.

206.   Upon information and belief, AIGGRE, as the general partner or manager of the AIGGRE-sponsored investment Funds, is also wrongfully withholding and/or misappropriating distributions of Profits Interests owed to the Tribecas.