UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
KEVIN P. FITZPATRICK, et al.,                                 :
                                                              :  No. 10-cv-142 (MHD)
                                     Plaintiffs,              :
                                                              :  ORAL ARGUMENT REQUESTED
              -against-                                       :
                                                              :
AMERICAN INTERNATIONAL GROUP, INC.                            :
and AIG GLOBAL REAL ESTATE                                    :
INVESTMENT CORPORATION,                                       :
                                                              :
                                     Defendants.              :
------------------------------------------------------------- x

# MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Charles P. Scheeler (*admitted pro hac vice*)
Keara M. Gordon (KG 2323)
Stephanie K. Vogel (SV 8591)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020
Tel:  (212) 335-4500
Fax:  (212) 335-4501

Michael J. Sheehan (*admitted pro hac vice*)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
191 N. Wacker Drive
Thirtieth Floor
Chicago, Illinois  60606
Tel:  (312) 499-6000
Fax:  (312) 499-6100

Attorneys for Defendants American
    International Group, Inc. and AIG Global
    Real Estate Investment Corporation.

**TABLE OF CONTENTS**

                                                      **Page**

I. LEGAL STANDARD ................................................................................................ 1

II. ARGUMENT ............................................................................................................. 2

    A. FITZPATRICK'S EMPLOYMENT AGREEMENT DID NOT CREATE A LEGAL ENTITLEMENT TO PROFITS INTERESTS.  THUS, COUNT II SHOULD BE DISMISSED AND THE COMPLAINT SHOULD BE STRICKEN TO THE EXTENT THAT IT CLAIMS ENTITLEMENTS TO PROFITS INTERESTS ARISING OUT OF FITZPATRICK'S EMPLOYMENT AGREEMENT. ........................................... 2

        1. Applicable Law ...................................................................................... 4

        2. The Defendants are Entitled to Summary Judgment On Count III and the Complaint Should be Stricken to the Extent That it Claims Entitlements to Profits Interests Arising Out of Fitzpatrick's Employment Agreement ............................................................................ 5

    B. FITZPATRICK HAS ADMITTED AWAY COUNT II ....................................... 9

    C. FITZPATRICK'S FIDUCIARY DUTY CLAIMS (COUNTS VII AND VIII) IMPERMISSIBLY DUPLICATE HIS CONTRACT CLAIMS. ............... 11

    D. THE DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT:  FITZPATRICK FAILED TO RESIGN FOR GOOD REASON ............................................................................................................. 11

CONCLUSION ............................................................................................................................ 16

# TABLE OF AUTHORITIES

**Case**                                                           **Page(s)**

150 Broadway N.Y. Assoc., L.P. v. Bodner,
  14 A.D.3d 1, 784 N.Y.S.2d 63 (1st Dep't 2004) ....................................................................7

Baraliu v. Vinya Capital, L.P.,
  2011 WL 102730 (S.D.N.Y. Jan. 6, 2011) (Dolinger, J.) .......................................................12

Burger King Corp. v. Horn & Hardart Co.,
  893 F.2d 525 (2d Cir. 1990).....................................................................................................5

Edge Grp. WAICCS LLC v. Sapir Group LLC,
  705 F. Supp. 2d 304 (S.D.N.Y. 2010) (Dolinger, J.) ............................................................1, 4

George Backer Mgmt. Corp. v. Acme Quilting Co.,
  46 N.Y.2d 211, 385 N.E.2d 1062, 413 N.Y.S.2d 135 (1978)...................................................4

In re MacMillan, Inc.,
  204 B.R. 378 (S.D.N.Y. Bankr. 1997)..................................................................................4, 5

Israel v. Chabra,
  537 F.3d 86 (2d Cir. 2008).....................................................................................................12

Lemus v. Manhattan Car Wash, Inc.,
  2010 WL 1372705 (S.D.N.Y. March 26, 2010) (Dolinger, J.).................................................5

Luna v. Amer. Airlines,
  2011 WL 280803 (S.D.N.Y. Jan. 6, 2011) (Dolinger, J.).........................................................4

Metro. West Asset Mgmt., LLC v. Shenkman Cap. Mgmt., Inc.,
  2005 WL 1963943 (S.D.N.Y. Aug. 16, 2005).........................................................................5

Morgenroth v. Toll Bros., Inc.,
  60 A.D.3d 596, 876 N.Y.S.2d 378 (1st Dep't 2009) .............................................................11

Nat'l Fuel Gas Dist. Corp. v. Hartford Fire Ins. Co.,
  28 A.D.3d 1169, 814 N.Y.S.2d 436 (4th Dep't 2006)............................................................12

Nat'l Granite Title Ins. Agency, Inc. v. Cadlerock Props. Joint Venture, L.P.,
  5 A.D.3d 361, 773 N.Y.S.2d 86 (2d Dep't 2004)....................................................................4

Nat'l Hockey League Players' Assoc. v. Bettman,
  1994 WL 738835 (S.D.N.Y. Nov. 9, 1994) (Dolinger, J.) .......................................................5

O'Neil v. Ret. Plan for Salaried Emps. of RKO General, Inc.,
    1994 WL 524089 (2d Cir. Sept. 26, 1994) ................................................................5

Robin Bay Assocs., Inc. v. Merrill Lynch & Co.,
    2008 WL 2275902 (S.D.N.Y. June 3, 2008) ..........................................................11

Shade v. Hous. Auth. of the City of New Haven,
    251 F.3d 307 (2d Cir. 2001)......................................................................................1

Stonebridge Cap., LLC v. Nomura Int'l PLC,
    68 A.D.3d 546, 891 N.Y.S.2d 56 (1st Dep't 2009) ...............................................4, 7

TAG 380 LLC v. ComMet 380, Inc.,
    10 N.Y.3d 507, 860 N.Y.S.2d 433 (2008) ...............................................................4

William Kaufman Org. Ltd. v. Graham & James LLP,
    703 N.Y.S.2d 439 (1st Dep't 2000) ........................................................................11

**Statute**

Fed. R. Civ. P. 56(c) ............................................................................................................1

The defendants, American International Group, Inc. ("AIG") and AIG Global Real Estate Investment Corporation ("AIGGRE", collectively with AIG, the "Company") respectfully submit this memorandum of law in support of their motion for summary judgment as to Counts II, III, VII and VIII of the plaintiffs' First Amended Complaint ("Complaint") and for partial summary judgment that: (1) Fitzpatrick has no legal rights to profits interests arising from his employment agreement, dated April 13, 2001 (the "Employment Agreement"), and that such allegations in the Complaint be stricken; and (2) plaintiff Kevin Fitzpatrick ("Fitzpatrick") did not resign for "Good Reason".

## I.   LEGAL STANDARD

As the Court well knows, summary judgment is appropriate when no genuine dispute as to the material facts exists. Fed. R. Civ. P. 56(c); Edge Grp. WAICCS LLC v. Sapir Grp. LLC, 705 F. Supp. 2d 304, 308 (S.D.N.Y. 2010) (Dolinger, J.). Under this standard, a fact is "material" if it might affect the outcome of the suit, and a dispute is "genuine" if the evidence could cause a reasonable jury to decide the matter in the non-moving party's favor. Edge Grp., 705 F. Supp. 2d at 308 (relying on Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001)). The Court's role is reserved to assessing whether there exists factual issues to be tried, drawing reasonable inferences against the moving party. Id.

For purposes of this motion, the pertinent undisputed facts are set forth within each argument and in the accompanying Defendants' Statement Pursuant to Local Rule 56.1 of Material Facts as to Which There Is No Genuine Issue.

## II. ARGUMENT

### A. FITZPATRICK'S EMPLOYMENT AGREEMENT DID NOT CREATE A LEGAL ENTITLEMENT TO PROFITS INTERESTS. THUS, COUNT II SHOULD BE DISMISSED AND THE COMPLAINT SHOULD BE STRICKEN TO THE EXTENT THAT IT CLAIMS ENTITLEMENTS TO PROFITS INTERESTS ARISING OUT OF FITZPATRICK'S EMPLOYMENT AGREEMENT.

Fitzpatrick claims that his employment agreement, dated April 13, 2001 (the "Employment Agreement"), entitles him to a share of the profits from the sale of any AIG real estate asset anywhere in the world, in perpetuity, even if it was acquired before he was born and even if GRE played no role in the purchase, management or disposition of the asset. (See Exhibit 1, 39:18-40:5, 53:24-55:21, 187:2-23, 188:23-189:3, 193:13-22; 454:20-455:13).[1] The Employment Agreement, however, unambiguously states that Fitzpatrick was to receive "a partnership interest" in entities which, in turn, would hold interests in the properties subject to profits interests. (Exhibit 2, § 3(b)(i)).[2] It was these "partnership interests" to be held by Fitzpatrick that would create the legal "entitle[ment] . . . to receive such share of the profits realized on such investments as 'partners.'" (Id.). In short, Fitzpatrick's rights to profits interests derive from the partnership and limited liability company interests he obtained through what became known as the Tribeca agreements, and not through the Employment Agreement itself.

Fitzpatrick's Employment Agreement introduces the concept of profits interests as follows:

---

[1]   Exhibit 1 contains a compilation of excerpts from the transcript of Fitzpatrick's January 12 and 13, 2011 deposition, and it is attached to the Declaration of Stephanie K. Vogel, dated March 14, 2011 (the "Vogel Declaration").

[2]   Exhibit 2 to the Vogel Declaration is Fitzpatrick's Employment Agreement, dated April 13, 2001.

- "AIG desires that you and the other key employees of AIG GREIC designated with the consent of the CIO (collectively, the Principals) share in the profits realized by AIG on the Direct Investments."[3]  (Exhibit 2, § 3(b)(i)).

The Employment Agreement then establishes the legal framework through which these profits interests will be awarded:

- "In furtherance of this, the Principals shall be admitted as limited partners or members of the partnership, limited liability company or other similar entity that holds a Direct Investment, and <u>shall receive a 'partnership interest' in such entity that will entitle them to receive such share of the profits realized on such investment as 'partners'</u>."  (Id. (emphasis added)).

Next, the Employment Agreement describes the process through which these partnerships and limited liability companies would be created:

- "To accomplish this, you are authorized to work in conjunction with the AIG Law Department and the AIG Tax Department to form one or more limited liability companies, partnerships or other entities, with your self as the sole managing member or general partner (as the case may be), and to admit to such entity those individuals you deem appropriate with the consent of the CIO, the form of the template for the governing document for any such entity to be agreed in advance with the CIO and AIG Law Department."  (Id.).

The Employment Agreement left no doubt that subsequent documentation was required to be created to establish these partnership interests, which in turn would "entitle [the Principals] to receive a share of the profits as partners…" (Id., § 3(b)(i)):

- "The documentation evidencing the Profits Interests shall be mutually agreed upon by AIG and you."  (Id., § 3(b)(xi)).

Finally, the Employment Agreement reiterated that the profits interests must solely derive from partnership and limited liability interests, as opposed to services rendered under an Employment Agreement:

- "The Profits Interests are not intended to be compensation income to you, and AIG agrees that they will be treated for all purposes not to be such."  (Id., § 7(i)).

---

[3]     The "CIO" is the abbreviation for AIG's Chief Investment Officer.

As explained more fully below, these provisions unambiguously establish that Fitzpatrick's rights to profits interests derive from the "partnership interest[s] in such entit[ies] that **will entitle them** [the Principals] to receive such share of profits realized on such investment[s] as 'partners'." (Exhibit 2, § 3(b)(i) (emphasis added)). Thus, it is the Tribeca agreements, not the Employment Agreement, through which Fitzpatrick is entitled to claim profits interests.

1. Applicable Law

Interpretation of an unambiguous contract is a matter of law for the courts, suitable for summary judgment. Edge Grp., 705 F. Supp. 2d at 321 (S.D.N.Y. 2010); Nat'l Granite Title Ins. Agency, Inc. v. Cadlerock Props. Joint Venture, L.P., 5 A.D.3d 361, 362, 773 N.Y.S.2d 86, 87 (2d Dep't 2004). The court's objective when interpreting contracts is to ascertain the parties' intentions as derived from the language they chose. Edge Grp., 705 F. Supp. 2d at 321 ("As the New York Court of Appeals has long held, 'when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.'") (quoting TAG 380 LLC v. ComMet 380, Inc., 10 N.Y.3d 507, 512-13, 860 N.Y.S.2d 433, 436 (2008)); In re MacMillan, Inc., 204 B.R. 378, 401 (S.D.N.Y. Bankr. 1997); Stonebridge Cap., LLC v. Nomura Int'l PLC, 68 A.D.3d 546, 547, 891 N.Y.S.2d 56, 58 (1st Dep't 2009) (expressing the "'heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties.'") (quoting George Backer Mgmt. Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 219, 413 N.Y.S.2d 135, 139 (1978)).

In doing so, care must be taken to construe the contract in such a way as to give meaning to all its provisions and avoid rendering any provision meaningless. Luna v. Amer. Airlines, 2011 WL 280803, at *8 n. 5 (S.D.N.Y. Jan. 6, 2011) (Dolinger, J.); Stonebridge Cap., LLC, 891

4

N.Y.S.2d at 58-59. Where the court finds that the contract is susceptible of only one reasonable interpretation, that is, where "the language of the contract is unambiguous, [then] its meaning is determined without reference to evidence outside the 'four corners' of the agreement." In re MacMillan, Inc., 204 B.R. at 401; Metro. West Asset Mgmt., LLC v. Shenkman Cap. Mgmt., Inc., 2005 WL 1963943, at *8 (S.D.N.Y. Aug. 16, 2005) ("Plaintiff's argument fails because extrinsic evidence such as defendants' course of conduct may be considered only when the contractual provisions at issue are ambiguous. Here, they are not."); Nat'l Hockey League Players' Assoc. v. Bettman, 1994 WL 738835, at *7 (S.D.N.Y. Nov. 9, 1994) (Dolinger, J.).

Whether an ambiguity exists "is resolved 'by reference to the contract alone,'" O'Neil v. Ret. Plan for Salaried Emps. of RKO General, Inc., 1994 WL 524089, at *4 (2d Cir. Sept. 26, 1994) (quoting Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir. 1990)), and should be resolved by reference to the contract as a whole. Lemus v. Manhattan Car Wash, Inc., 2010 WL 1372705, at *7 (S.D.N.Y. March 26, 2010) (Dolinger, J.). More importantly, unambiguous provisions do not become ambiguous merely because the parties advance contrary interpretations. Id.

2. The Defendants are Entitled to Summary Judgment on Count III and the Complaint Should be Stricken to the Extent That it Claims Entitlements to Profits Interests Arising Out of Fitzpatrick's Employment Agreement.

Fitzpatrick's Employment Agreement requires that "documentation evidencing the Profits Interests shall be mutually agreed upon by AIG and you." (Exhibit 2, § 3(b)(xi)). This statement plainly states that the Employment Agreement is **not** "the documentation evidencing the Profits Interests" (id.); otherwise, this clause would be meaningless.

The Employment Agreement further requires that the "documentation evidencing the Profits Interests" would establish business entities that would hold interests in "the Direct

Investments." (Exhibit 2, § 3(b)(i)). In turn, Fitzpatrick was to receive a "partnership interest" in these entities. Id. Those partnership interests were the legal mechanisms through which Fitzpatrick and the other Principals would receive profits interests. The Employment Agreement states:

> Specifically, AIG desires that the Principals receive 10% of AIG's profit in excess of a preferred return to AIG on its equity investment of 8% per annum <u>as 'partners'</u> for U.S. federal income tax purposes."

(Exhibit 2, § 3(b)(i) (emphasis added)). In the very next sentence, the Employment Agreement reiterates that the partnership interests to be held by the Principals **will** create the entitlement to profits interests:

> [i]n furtherance of this [desire that [the Principals, including Mr. Fitzpatrick] 'share in the profits realized by AIG on the Direct Investments'], the Principals <u>shall</u> be admitted as limited partners or members of the partnership, limited liability company or other similar entity that holds a Direct Investment, and <u>shall</u> receive a partnership interest in such entity <u>that will entitle them</u> to receive such share of the profits realized on such investment as partners.

(Id. (emphasis added)).

Three key clauses of the Employment Agreement: (1) the "requirement of documentation evidencing the Profits Interests" (Exhibit 2, § 3(b)(xi)); (2) the agreement that "the Principals receive 10% of AIG's profit . . . <u>as 'partners'</u>" (id., § 3(b)(i) (emphasis added)); and (3) the agreement that the partnership interest "will entitle the [Principals] to receive a share of the profits realized on such investments as 'partners'" (id.), are consistent with and give effect to the statement that "the Profits Interests are not intended to be compensation income to you." (Id., § 7(i)). This declaration that the profits interests should not be considered compensation would be a nullity if the profits interests derived from the Employment Agreement. In that event, the profits interests would be deemed to be consideration for the duties contemplated by

6

the Employment Agreement, and would be treated by the Internal Revenue Service as compensation. I.R.C. §61(a)(1); Treas. Reg. §1.61-2(a)(1) ("compensation for services on the basis of a percentage of profits . . . [is] income to the recipients unless excluded by law"). (See also Exhibit 2, § 3(b)(i): "AIG desires that the Principals receive 10% of AIG's profit in excess of a preferred return . . . as "partners" for U.S. federal income tax purposes").

Fitzpatrick bore the responsibility of drafting the partnership agreements with the AIG Law and Tax Departments (documentation that required the approval of AIG's Chief Investment Officer). (See Exhibit 2, § 3(b)(i), (viii)). Accordingly, his Employment Agreement empowered him to work with AIG's internal tax and legal departments to prepare the necessary documentation. (Id., § 3(b)(i)). Specifically, his contract provides that:

> To accomplish this, you [Fitzpatrick] are authorized to work in conjunction with the AIG Law Department and the AIG Tax Department to form one or more limited liability companies, partnerships or other entities, with yourself [Fitzpatrick] as the sole managing member or general partner (as the case may be) . . . .

(Id., § 3(b)(i)). Fitzpatrick did so. In fact, according to him, he formed and served as the managing member or general partner of 49 such business entities, each denominated a "Tribeca," and he named them as plaintiffs in this lawsuit.[4] (See Complaint, ¶¶ 12-115, 120, 122-23).

Long-standing principles of contract construction call on the court to "'avoid an interpretation that would leave contractual clauses meaningless.'" Stonebridge Cap., LLC, 891 N.Y.2d at 58-59 (quoting 150 Broadway N.Y. Assoc., L.P. v. Bodner, 14 A.D.3d 1, 6, 784 N.Y.S.2d 63, 66 (1st Dep't 2004)). Fitzpatrick's claim – that the Employment Agreement established the legal entitlement to profits interests, without requiring further acts to create this legal entitlement – would gut Section 3(b) of the Employment Agreement (entitled "Participation

---

[4] Moreover, as discussed above, Fitzpatrick testified that "all the Tribecas had been established as of April 2009." (Exhibit 1, 93:3-4).

in Direct Investments and Carried Funds") and not only render meaningless, but directly contradict, all of the following clauses:

- "AIG desires that you and the other key employees of AIG GREIC designated with the consent of the CIO (collectively, the Principals) share in the profits realized by AIG on the Direct Investments . . .. In furtherance of this, the Principals shall be admitted as limited partners or members of the partnership, limited liability company or other similar entity that holds a Direct Investment, and <u>shall receive a 'partnership interest' in such entity that will entitle them to receive such share of the profits realized on such investment as 'partners'</u>" (Exhibit 2, § 3(b)(i) (emphasis added));

- "To accomplish this, you are authorized to work in conjunction with the AIG Law Department and the AIG Tax Department to form one or more limited liability companies, partnerships or other entities, with your self as the sole managing member or general partner (as the case may be), and to admit to such entity those individuals you deem appropriate with the consent of the CIO, the form of the template for the governing document for any such entity to be agreed in advance with the CIO and AIG Law Department" (<u>id</u>.);

- "the Principals receive 10% of AIG's profit . . . <u>as 'partners'</u>." (<u>id</u>. (emphasis added));

- "<u>The documentation evidencing the Profits Interests shall be mutually agreed upon</u> by AIG and you." (<u>id</u>., § 3(b)(xi) (emphasis added); and

- "<u>The Profits Interests are not intended to be compensation income to you</u>, and AIG agrees that they will be treated for all purposes not to be such." (<u>Id</u>., § 7(i) (emphasis added)).

The unambiguous language of Section 3(b) of Fitzpatrick's Employment Agreement establishes that the parties agreed to create what became known as the Tribeca agreements, and it is those "'partnership interests' in such entities that will entitle them [the Principals] to receive such share of the profits realized on such investment as 'partners'." (<u>Id</u>., § 3(b)(i)).

In the Amended Complaint, the plaintiffs admit to the unambiguous interpretation that the Tribecas create the entitlement to the profits interests. They state in the Amended Complaint, "[u]nder Section 3(b)(x) of the 2001 Contract, upon the sale, disposition, or restructuring of a real estate investment, the Principals' share of profits realized from such a transaction must be

transferred <u>to the designated Tribeca entity</u> within 30 days of certification of the calculation of the Profits Interests by AIG's CIO."  (<u>See</u> Complaint, ¶¶ 172 (emphasis added)).  If, in fact, the Employment Agreement created independent rights to profit interests, the step of placing the profits into a Tribeca would not be necessary.  The plaintiffs recognize, however, that consistent with the requirement of the Employment Agreement that the profit interests not be considered compensation, the Tribeca entities create the entitlement to profit interests and amounts distributable as profit interests must derive from the Tribeca entities.

Accordingly, the Court should find that the Employment Agreement unambiguously states that what came to be known as the Tribeca agreements create the legal entitlement to profits interests.  The Employment Agreement, by its terms, does not create such rights; it requires further vehicles through which those rights will be conveyed.  Therefore, this Court should grant summary judgment in favor of the defendants on Count III (in which Fitzpatrick claims – solely through his Employment Agreement – profits interests on an asset known as Otemachi), and the Court should strike Fitzpatrick's other claims for profits interests allegedly arising from his Employment Agreement.  The portions of the Complaint that should be so stricken are set forth in Exhibit 3 to the Vogel Declaration (a "redlined" copy of pages excerpted from the Complaint).

### B.  FITZPATRICK HAS ADMITTED AWAY COUNT II.

Count II asserts that, in breach of Fitzpatrick's Employment Agreement, "AIG purposefully failed to fully execute documentation for additional Tribecas using the agreed upon template for documentation."  (Complaint, ¶ 278).  This claim fails because Fitzpatrick has admitted under oath at his deposition that "all Tribecas had been established" and, thus, has mooted this count:

9

Q. All right. Is it correct that by April 2009, to your knowledge, all Tribecas had been established? Is that correct?

A. No, I don't believe so.

Q. You think it's wrong.

A. April of 2009?

Q. Yes, sir.

A. Okay. **Yes, I'm sorry, all the Tribecas had been established as of April of 2009.**

Q. Okay. So you are not contending as of April 2009 that GRE or that anybody had failed to establish Tribecas that should have been established?

A. Well, I was unsure. There was a -- a number of Tribecas that were executed in -- executed in October of 2008 and I believe that there was a question as to whether they were in escrow or not in escrow, and I believe -- I'm not sure as to whether they were released from escrow or not in escrow.

\* \* \* \* \*

Q. Let me show you Exhibit 8, Mr. Fitzpatrick, which purports to be a letter from you to Ms. Reynolds dated April 24, 2009. Do you recognize that document?

A. Yes, sir.

Q. All right. And looking at the first sentence of the last paragraph, is it correct that you stated with regard to Number 4: "To the best of my knowledge, all Tribecas are established"?

A. Yes, sir.

Q. Was that an accurate statement at the time?

A. Yes, sir, all of the Tribecas had been executed.

Q. I'm sorry. What did you say?

A. All of the Tribecas had been executed.

(Exhibit 1, 92:19-94:20) (emphasis added).

Fitzpatrick's admissions require that the Court grant the defendants summary judgment on Count II.

### C. FITZPATRICK'S FIDUCIARY DUTY CLAIMS (COUNTS VII AND VIII) IMPERMISSIBLY DUPLICATE HIS CONTRACT CLAIMS.

Fitzpatrick's fiduciary duty claims fail as a matter of law because he admits those claims duplicate his contract claims. When asked point-blank, "what's the factual basis for your claim that AIG has a fiduciary duty to the plaintiffs in this case[?]", Fitzpatrick replied that "AIG has a responsibility to honor the contract." (Exhibit 1, 720:21-721:6). This admission, of course, is fatal to those fiduciary duty claims.

The law is clear. "In New York, '[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." Robin Bay Assocs., Inc. v. Merrill Lynch & Co., 2008 WL 2275902, at *3 (S.D.N.Y. June 3, 2008) (quoting William Kaufman Org. Ltd. v. Graham & James LLP, 703 N.Y.S.2d 439, 442 (1st Dep't 2000) and dismissing duplicative fiduciary duty claims as a matter of law); see also Morgenroth v. Toll Bros., Inc., 60 A.D.3d 596, 597, 876 N.Y.S.2d 378, 380 (1st Dep't 2009) (affirming grant of summary judgment because "the [breach of fiduciary duty] claim is duplicative of the breach of contract claim since it fails to allege breach of any fiduciary duty independent of the contract itself.").

### D. THE DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT: FITZPATRICK FAILED TO RESIGN FOR GOOD REASON.

Fitzpatrick claims that he resigned for "Good Reason". (Complaint, ¶¶ 126, 232-33, 261). Fitzpatrick's purported resignation for "Good Reason", however, must be rejected as a matter of law because the complaints he identified fail to meet the substantive and/or timing requirements of his Employment Agreement.

The Employment Agreement defines "Good Reason" as "the occurrence, without your consent, of any of the following events: (i) the assignment of duties, titles or responsibilities that are different from, and result in the diminution of, the duties, titles and responsibilities described herein; or (ii) a material breach by AIG of any of its obligations hereunder." (Exhibit 2, § 4(c)). Then, it limits those substantive bases with an explicit time limitation:

> "**provided in any such case that within 30 business days following the occurrence of any such event**, you shall have delivered written notice to AIG of your intention to terminate employment for Good Reason, which notice specifies in reasonable detail the circumstances claimed to give rise to your right to terminate your employment for Good Reason . . . ."

(Id. (emphasis added)).

The notice requirement is a necessary condition precedent to enforcing a purported resignation for "Good Reason". In Israel v. Chabra, 537 F.3d 86 (2d Cir. 2008), the Court held that as a matter of New York law an employer's personal guarantee of a bonus payments agreement, which "provided . . . that [employee] has given Guarantor written notice . . . of [employer's] failure to pay any Obligation within 60 days of the occurrence of each failure", created a condition precedent to the obligation. The Court stated:

> Over time, the law has come to recognize and enforce the use of linguistic conventions to create conditions precedent. For example, the Appellate Division recently observed that the word 'provided,' placed immediately before a contractual requirement, 'indicates the creation of a condition.'

Id. at 93 (quoting Nat'l Fuel Gas Dist. Corp. v. Hartford Fire Ins. Co., 28 A.D.3d 1169, 1170, 814 N.Y.S.2d 436, 437 (4th Dep't 2006)). In this case, the quoted language of the Employment Agreement above also uses the term "provided" placed immediately before the contractual requirement, thus establishing the temporal limitation as a condition precedent. See also Baraliu v. Vinya Capital, L.P., 2011 WL 102730, at *8 (S.D.N.Y. Jan. 6, 2011) (Dolinger, J.) (where a

contract contains terms that communicate explicitly a precondition to performance, "literal observance" is required).  Because Fitzpatrick's notice of intent to resign is dated March 25, 2009, his resignation for Good Reason is effective if – but only if – the occurrences set forth in that letter met the substantive requirements imposed **and** occurred on or after February 10, 2009: i.e., 30 business days before the date of his letter.

Fitzpatrick's notice of intent to resign letter admits in the very first paragraph that the claims of breach he proffered as his "Good Reason" occurred more than 30 business days before his letter:

> I am writing to provide you with notice of my intention to resign as President of AIG Global Real Estate Investment Corp. ("AIG GRE") for Good Reason.  **For many months**, I have been trying to resolve a myriad of issues regarding the future of AIGGRE in the context of contractual obligations to me and the AIGGRE management team.  In response, AIG has unjustifiably refused to honor contractual obligations entered into by AIG long before the current market crisis, despite significant effort on the part of the AIGGRE management team to explain the history and nature of the various contractual arrangements underlying AIG's real estate business, and has effectively assumed management of AIGGRE.

(Exhibit 4, at GRE00088617 (emphasis added)).[5]  All of Fitzpatrick's asserted bases for resignation, as set forth in his notice of resignation letter, fail to satisfy either the substantive or temporal requirements of the Employment Agreement, or both.

First, Fitzpatrick's March 25 Letter references AIG allegedly "repeatedly refusing to pay money owed . . . and improperly holding it in AIG's coffers."  (Id., at GRE00088619). Fitzpatrick's letter confirms that this was not a recent occurrence, as he admits that this alleged failure remained an issue "[d]espite months of discussions."  Id.  This untimeliness, moreover, is confirmed elsewhere.  Fitzpatrick made these very same allegations in a *draft* resignation letter

---

[5]  Exhibit 4 to the Vogel Declaration is Fitzpatrick's letter to Paula R. Reynolds, dated March 25, 2009, GRE00088617 through GRE00088625, (the "March 25 Letter").

dated October 7, 2008 in which he listed AIG's failure to implement "the provisions of Section 3(b) of the Employment Agreement relating to the Profits Interests" – that is, the provisions relating to his payment via the Tribeca structure – as "Good Reason" for resignation at *that* time (more than five months before the March 25 Letter). (Exhibit 5;[6] see also Exhibit 6 (complaining in a presentation dated January 23, 2009 to his boss, Paula Reynolds, that AIG owed the Tribeca program $27 million for the third quarter of 2008 and $0.5 million for the fourth quarter of 2008)).[7]

Second, Fitzpatrick's March 25 Letter asserts that the process by which AIGGRE was forced to operate following the federal government's intervention in AIG in September 2008 supposedly divested him of "the management role expressly provided for by contract." (Exhibit 4, at GRE00088622). While the defendants disagree with the legal conclusions espoused by Fitzpatrick, even assuming he was correct in his contractual interpretation, this was old news by March 25 and, thus, insufficient under Fitzpatrick's Employment Agreement. This too is reconfirmed by Fitzpatrick's own October 7 draft letter. (Exhibit 5, at GRE00739124 (complaining of a failure by AIG to implement "the provisions of Section 1 relating to my full executive authority over day-to-day operations of AIGGRE and the management of the Funds . . . and my serving as manager of certain Fund entities.")).

Third, Fitzpatrick's March 25 Letter asserts that he no longer had sufficient access to capital because AIG would "not ensure capital is committed to the fund business" and the "Steering Committee . . . want[s] to approve all capital requests for funds." (Exhibit 4, at GRE00088624). These complaints also were consequences of the September 2008 federal

---

[6] Exhibit 5 to the Vogel Declaration is an email from Larry Witdorchic, Esq. to Fitzpatrick attaching a draft resignation letter, dated October 7, 2008, GRE00739117 through GRE00739126.

[7] Exhibit 6 to the Vogel Declaration is a PowerPoint presentation that Fitzpatrick prepared for Ms. Reynolds on January 23, 2009.

intervention and occurred more than 30 business days before Fitzpatrick's March 25 Letter. His deposition testimony admits precisely that timing:

> Q. But – but you never were given any indication or – or learned through any source why GRE was – was treated, in your words, so uniquely following the – in Fed intervention in September 2008?
>
> [. . .]
>
> A. After the Fed came in, we operated in a normal fashion *for the first 30 or 45 days* and then all of a sudden we had this issue that we couldn't get any funding from the AIG parent.

(Exhibit 1, 603:4-21 (emphasis added)). This, again, is old news.

<u>Fourth</u>, Fitzpatrick's March 25 Letter also states that AIG no longer allowed payments of profits interests to employees in accounting and legal positions to avoid conflicts of interest. But, this is not "Good Reason" because it is not a breach at all: Fitzpatrick's Employment Agreement never granted him the unilateral right to select which of his employees might receive such profits interests; rather, their selection expressly was subject to "the consent of the CIO." (Exhibit 2, § 3(b)(i)). Even if it were a breach (which it is not), this also admittedly occurred more than 30 days before Fitzpatrick's March 25 Letter. (Exhibit 3, at ¶ 192 ("In or about September 2007, Jeffrey Hurd, then-Chief Administrative Officer of AIG Investments, advised Mr. Fitzpatrick that members of the accounting and legal teams would no longer be permitted to receive Profits Shares distributions . . . .")).

<u>Finally</u>, Fitzpatrick's March 25 Letter contends that AIG "has done audits of the Tribeca accounts and represented that they are the management of the Tribecas when they are not." (Exhibit 4, at GRE00088624). This does not state a "Good Reason" for resignation (as that term is defined in the Employment Agreement) because: (1) the internal audit report does not say

what Fitzpatrick alleges it says; and (2) even if it did, a statement in an audit report does not amount to a diminishment of duties or material breach of contract.  (See Exhibit 7).[8]

In short, none of the reasons for which Fitzpatrick purportedly resigned meet both the substantive and the timing requirements set forth in his Employment Agreement.  As a result, his claim to have resigned with "Good Reason" is groundless, and this Court should grant summary judgment in the defendants' favor.  The portions of the Complaint that should be so stricken are set forth in Exhibit 8 to the Vogel Declaration (a "redlined" copy of pages excerpted from the Complaint).

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that the Court grant their motion for partial summary judgment.

Dates:  New York, New York
March 14, 2011

/s/ Charles P. Scheeler
Charles P. Scheeler (*admitted pro hac vice*)
Keara M. Gordon (KG 2323)
Stephanie K. Vogel (SV 8591)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020
Tel:  (212) 335-4500
Fax:  (212) 335-4501

Michael J. Sheehan (*admitted pro hac vice*)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
191 N. Wacker Drive
Thirtieth Floor
Chicago, Illinois  60606
Tel:  (312) 499-6000
Fax:  (312) 499-6100

---

[8] Exhibit 7 to the Vogel Declaration is an e-mail dated February 13, 2009 attaching the Internal Audit Report of the same date, GRE00083660 through GRE00083669.